MID ATLANTIC TELECOM,
INCORPORATED, Plaintiff–
Appellant,

v.

LONG DISTANCE SERVICES, INCOR-
PORATED, a/k/a Long Distance Service
of Washington, Incorporated; Richard J.
Rice, Defendants–Appellees.

No. 93–1458.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 26, 1993.

Decided March 3, 1994.

**ARGUED:** Harry Martin Rifkin, Semmes,
Bowen & Semmes, Baltimore, Maryland, for
Appellant. John Joseph Sullivan, Guerrieri,
Edmond & James, P.C., Washington, D.C.,
for Appellees.

**ON BRIEF:** Franklin T. Caudill, Semmes,
Bowen & Semmes, Baltimore, Maryland, for
Appellant. Edgar N. James, Guerrieri, Ed-
mond & James, P.C., Washington, D.C., for
Appellees.

Before WILKINS and WILLIAMS,
Circuit Judges, and SPROUSE, Senior
Circuit Judge.

### OPINION

SPROUSE, Senior Circuit Judge:

Mid Atlantic Telecom, Inc. (Mid Atlantic)
instituted this civil action against Long Dis-
tance Services, Inc. (LDS), charging LDS
and its president, Richard Rice, with viola-
tions of the Racketeer Influenced and Cor-
rupt Organizations Act (RICO), 18 U.S.C.
§§ 1962(a) and (c), and conspiracy to violate
those sections under § 1962(d). Mid Atlantic
also brought state law claims of unfair com-
petition and tortious interference with its
contracts and business relationships. After
LDS filed a motion to dismiss Mid Atlantic's
complaint, Mid Atlantic submitted an amend-
ed complaint. Without allowing the plaintiff
the opportunity to engage in discovery, the
district court granted summary judgment in
favor of the defendants. In a revised order,
the district court declined to exercise juris-
diction over the plaintiff's state law claims
and dismissed them without prejudice. Mid
Atlantic appeals the grant of summary judg-
ment, complaining particularly about the
court's decision to grant summary judgment
prior to discovery.

## I

Mid Atlantic and LDS are resellers of long-distance telecommunications services in the mid-Atlantic region of the United States. As resellers, they purchase time wholesale on the transmission lines of common carriers, such as AT & T, Sprint, and MCI, and then sell that time to customers. Because resellers are able to purchase time from common carriers at a rate below tariff, they can offer customers lower rates and can develop specialized services and rate plans for their clients. The market shares for regional resellers are limited, and Mid Atlantic and LDS have less than one percent of the long-distance market in their region.

Resellers, like other long-distance telephone service providers, charge their customers on a per minute basis. The rate may fluctuate according to the time of day during which calls are placed or the distance between callers. In order to register this information, telephone companies rely on complicated switching equipment and billing software. During one weekend in 1986, an employee of defendant LDS neglected to turn on certain switching equipment. As a result, LDS was unable to record any data regarding use of its transmission lines. When the error was discovered, Richard Rice, the president of LDS, instructed Henry Luken, an employee of the firm, to develop a program to recoup the losses. Luken created a computer program that randomly added minutes to the calls of LDS customers. By artificially inflating the lengths of calls, LDS was able to charge excessive prices and recover its losses from the weekend in 1986.

Mid Atlantic asserts that LDS did not eliminate the fraudulent billing scheme after it had compensated itself for the losses of the one weekend. Instead, Rice allegedly insisted that LDS employees continue to use the inflated billing program to offer artificially lower rates to new customers and entice Mid Atlantic customers to sign up with LDS.[1] In practical effect, however, the quoted rates were not lower, since additional minutes were randomly and artificially added to the lengths of telephone calls. The fraudulent billing scheme apparently ceased in 1991 when the Federal Bureau of Investigation served a search warrant on LDS's offices.

In its amended complaint filed on April 13, 1992, Mid Atlantic alleged that LDS and its president violated §§ 1962(a) and (c)[2] of RICO and conspired to violate those sections in contravention of § 1962(d)[3] of RICO. In support of these claims, Mid Atlantic accused LDS and Rice of engaging in a pattern of racketeering activity by fraudulently using the mails and telephone wires to solicit customers of Mid Atlantic in violation of 18 U.S.C. §§ 1341 and 1343. According to the complaint, LDS's billing scheme enabled it to offer artificially low rates which forced Mid Atlantic to match LDS's low rates or lose its customers. Because of these lost revenues and customers, Mid Atlantic claims that it meets the injury requirement of § 1964(c)[4] of RICO and has standing to sue.

---

1. At oral argument, counsel for LDS conceded, for purposes of this appeal, that LDS fraudulently solicited customers by randomly assigning more time to telephone calls made through LDS.

2. Section 1962(a) states:
   It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
   18 U.S.C. § 1962(a).
   Section 1962(c) states:

   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
   18 U.S.C. § 1962(c).

3. Section 1962(d) states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

4. Section 1964(c) states: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sus-

The district court first ruled as a matter of law that LDS and its president Rice did not enter into a conspiracy. This ruling is not contested on appeal. The court then, without allowing discovery, granted summary judgment in favor of LDS on the ground that the activities conducted by LDS could not have been the proximate cause of Mid Atlantic's injuries under the Supreme Court's ruling in *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Mid Atlantic consequently pursued this appeal.

## II

Our review of a district court's grant of a motion for summary judgment is *de novo*, employing the same standards applied by the district court. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1127–28 (4th Cir.1987). Under those standards, the non-movant, in order to prevail, must produce sufficient evidence to create a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The district court's decision denying Mid Atlantic's request to conduct discovery is subject to review under the abuse of discretion standard. *See Cohn v. Bond*, 953 F.2d 154, 157 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3057, 120 L.Ed.2d 922 (1992).

In *Holmes*, —— U.S. at ——, 112 S.Ct. at 1311, the Supreme Court addressed the causation requirements of § 1964(c) of RICO. It held that the same causation principles discussed in *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), are implicated in § 1964(c). *Holmes*, —— U.S. at ——————, 112 S.Ct. at 1317–18. In *Associated Gen. Contractors*, the Supreme Court examined the causation requirements of section 4 of the Clayton Act.[5] Under that statute, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor...." 15 U.S.C. § 15(a). The Court concluded that the appropriate inquiry to determine whether a plaintiff was injured "by reason of" a violation of the antitrust laws was the same as the common law test for determining proximate causation. *Associated Gen. Contractors*, 459 U.S. at 535–36, 103 S.Ct. at 907–08.

Confronting the identical "by reason of" language in the RICO context, however, the *Holmes* Court cautioned against an overly expansive view of proximate cause: "[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Holmes*, —— U.S. at ——, 112 S.Ct. at 1318. In *Holmes*, the Securities Investor Protection Corp. ("SIPC") had sued the perpetrators of a stock manipulation scheme to satisfy the claims of customers of broker-dealer firms that had failed in the wake of their purchase of the manipulated stocks.[6] The Court refused to find that the scheme operators' actions were the proximate cause of the investors' injuries: "The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors." *Id.* at 1319.

In *Holmes*, the Court was particularly concerned with the assertion of the rights of the directly injured targets of the RICO conspiracy by plaintiffs who had only been indirectly injured. The Court reasoned that the broker-dealers were the targets of the stock manipulators' scheme and could be counted on to vindicate their rights. In contrast, the injuries suffered by the broker-dealers' customers were merely derivative of the injuries suffered by the investment firms themselves. "Allowing suits by those injured only indirectly would open the door to 'massive and complex damages litigation [which would] not only burde[n] the courts, but also undermin[e] the effectiveness of treble-damages suits.'" *Id.* at 1321 (quoting *Associated Gen.*

---

tains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

**5.** 15 U.S.C. § 15.

**6.** The SIPC had sued under a common law subrogation theory which was ultimately rejected by the Supreme Court.

*Contractors,* 459 U.S. at 545, 103 S.Ct. at 912).

■ In *Brandenburg v. Seidel,*[7] 859 F.2d 1179, 1187 (4th Cir.1988), we pointed out that the "by reason of" language in § 1964(c) "requires the plaintiff to make two closely related showings: (1) that he has suffered injury to his business or property; and (2) that this injury was caused by the predicate acts of racketeering activity that make up the violation of § 1962." The plaintiffs in *Brandenburg* sued, among others, the former officers and directors of MSSIC for losses they suffered when the deposit insurance system collapsed. The depositors claimed they were injured by reason of MSSIC mailings that contained misrepresentations about the stability of the Maryland savings and loan industry. We found that the plaintiffs had alleged an attenuated cause-in-fact connection between the defendants' conduct and their injury. *Id.* at 1189.

In affirming the grant of summary judgment in favor of the defendants, we noted that "[s]uch a cause-in-fact connection, standing alone, does not suffice to establish liability. Civil RICO is, of course, a statutory tort remedy—simply one with particularly drastic remedies. Causation principles generally applicable to tort liability must be considered applicable." *Id.* at 1189. In *Brandenburg,* the causal connection was considered too tenuous, and the plaintiffs' theory ignored the more immediate causes of their injuries (i.e., duplicity by the management of savings and loans and failure of MSSIC to prevent those depredations). Where the injuries were more appropriately attributable to intervening causes that were not predicate acts under RICO, the RICO action could not lie. *Id.* at 1190.

LDS and Rice argue that *Holmes* and *Brandenburg* compel the result reached by the district court. Mid Atlantic does not allege that it received mail or telephone solicitations offering artificially low rates, merely that its customers did. LDS and Rice contend that their customers were the only victims of the alleged fraud and only those customers can assert their rights. They further maintain that any injury to Mid Atlantic stemmed from the independent intervening acts of Mid Atlantic customers after LDS's solicitations. It follows, the appellees argue, that the solicitations could not have been the proximate cause of Mid Atlantic's injuries.

■ We are unable to agree. In *Brandenburg,* 859 F.2d at 1189, it was recognized that "the legal cause determination is properly one of law for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Brandenburg* also explained that proximate causation requires a nexus between the proscribed acts and the injuries. *Id.* at 1187. We did not, however, intend to establish a rule that only injuries suffered by the immediate victim of a predicate act satisfied the "by reason of" requirement of § 1964(c). In conducting the traditional common-law proximate cause analysis, therefore, courts should focus on the temporal and circumstantial relationship between the defendant's conduct and the injury suffered by the plaintiff, and the foreseeability that intervening events would cause injury to the plaintiff. *Id.* at 1189.

In its amended complaint, Mid Atlantic alleges that LDS engaged in fraudulent use of the mails and telephone wires to entice customers away from Mid Atlantic and to eliminate Mid Atlantic as a competitor. Taking the complaint at face value, it cannot be said that we are confronted with circumstances similar to those presented in *Brandenburg,* where the intervening acts were wholly independent of the alleged predicate acts. LDS customers, of course, were the direct victims of the defendants' scheme to fraudulently inflate their telephone bills. Given the opportunity to engage in discovery, however, Mid Atlantic may be able to show that while the scheme was initially aimed only at defrauding LDS customers, Rice broadened the sweep of the intrigue to include Mid Atlantic as a direct target (i.e., to obtain an unfair competitive advantage in recruiting Mid Atlantic customers). Discovery might or might not reveal that the artificially low billings were purposefully devised to lead to harm to Mid Atlantic.

7. *Brandenburg* involved consideration of the causation requirements of § 1964(c) in the context of the collapse of the Maryland Savings–Share Insurance Corporation (MSSIC).

A finding of proximate cause in such a situation would not be at odds with the Supreme Court's holding in *Holmes*, since Mid Atlantic is not seeking to vindicate the rights of its former customers who may have been offered fraudulently low rates. Furthermore, Mid Atlantic's injuries, as alleged, are not derivative of any losses suffered by its former customers. Rather, it claims distinct and independent injuries: lost customers and lost revenue due to the necessity of offering lower rates to match LDS's fraudulent ones.[8] At this point, these claims are not established, but they are alleged in the complaint, and the plaintiff should have the opportunity to develop support for its claims through discovery. The district court, after discovery, will be in a better position to consider "such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." *Brandenburg*, 859 F.2d at 1189.

LDS and Rice argue that summary judgment is appropriate on an alternative ground. They contend that Mid Atlantic was aware of LDS's use of the fraudulent billing program and how that program enabled LDS to offer artificially low rates; therefore, Mid Atlantic could not have relied on LDS's proffered lower rates in setting its own rates. Absent reliance, Mid Atlantic could not bring a RICO claim under § 1964(c). This argument is predicated on *Brandenburg* where we stated: "[W]hile . . . it is not necessary to establish detrimental reliance by the victim in order to make out a violation of the federal mail fraud statute, such reliance is necessary to establish injury to business or property 'by reason of' a predicate act of mail fraud within the meaning of § 1964(c)." *Brandenburg*, 859 F.2d at 1188 n. 10 (citation omitted). Because the district court based its proximate cause determination on the Supreme Court's decision in *Holmes*, it did not resolve the reliance issue. In light of the factual uncertainties surrounding Mid Atlantic's allegations of solicitation of its customers, resolution of the reliance issue should be deferred until completion of discovery on remand.

In sum, we hold that the district court abused its discretion in denying Mid Atlantic's request for discovery to establish support for its claim that it was an intended target of LDS's fraudulent scheme. Summary judgment is vacated and the case is remanded for action consistent with the views expressed in this opinion.

*VACATED AND REMANDED WITH INSTRUCTIONS.*

---

**8.** LDS and Rice draw our attention to a district court opinion in *Lifschultz Fast Freight v. Consolidated Freightways Corp.*, 805 F.Supp. 1277 (D.S.C.1992), *aff'd.*, 998 F.2d 1009 (4th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993). In that case, the plaintiff, a defunct trucking company, had sued its former competitors under RICO, charging mail and wire fraud as predicate acts. The plaintiff had accused the defendants of sending misleading tariff reports to rate bureaus, competitors, and the Interstate Commerce Commission and claimed that it was driven out of business as a result of this fraud. Acting with the benefit of full discovery, the district court first ruled that there was no evidence to support the claims of mail and wire fraud. It then ruled that any link between the alleged violations and the injury was at best remote and tenuous. *Lifschultz Fast Freight*, 805 F.Supp. at 1290–91. "Any harm from the alleged conspiracy would be purely contingent on how the rate bureaus and the ICC acted based on the alleged predicate acts and then the customers' taking action based on the ICC action." *Id.* at 1291. We affirmed in an unpublished opinion, *Lifschultz Fast Freight v. Consolidated Freightways Corp.*, No. 92–2523, 1993 WL 241742, at ⊦1, 1993 U.S.App. LEXIS 16974, at *3 (4th Cir. July 6, 1993) (per curiam), relying in part on the district court's finding that the alleged predicate acts were not part of a scheme to defraud another of money or property. Here, without benefit of discovery, we are unable to conclude that the alleged mail and wire fraud committed by LDS and Rice were not part of a scheme to defraud Mid Atlantic of money such that Mid Atlantic's injuries could not have been proximately caused by LDS. It is therefore premature to address whether reasoning in *Lifschultz* compels a result in this dispute.