**IDEAL STEEL SUPPLY CORP.,**
Plaintiff–Appellant,

v.

**Joseph ANZA, Vincent Anza, and
National Steel Supply, Inc.,**
Defendants–Appellees.

**Docket No. 03–7381.**

United States Court of Appeals,
Second Circuit.

Argued: Dec. 16, 2003.

Decided: July 2, 2004.

Marshall Beil, New York, New York (Lisa J. Borodkin, Holly M. Travis, McGuireWoods, New York, New York, on the brief) for Plaintiff–Appellant.

Richard L. Huffman, New York, New York (William M. Brodsky, Marijke van Ekris, Fox Horan & Camerini, New York, New York, on the brief), for Defendants–Appellees.

Before: WALKER, Chief Judge, and KEARSE and CABRANES, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiff Ideal Steel Supply Corp. ("Ideal") appeals from a judgment of the United States District Court for the Southern District of New York, Richard M. Berman, *Judge*, dismissing its amended complaint, brought principally under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (2000) ("RICO"), alleging that Ideal's business had been injured by reason of the practice of defendants National Steel Supply, Inc. ("National"), *et al.*, of failing to charge certain customers sales taxes as required by New York State ("State") law and thereafter sending the State Department of Taxation and Finance ("State Tax Department") fraudulent sales tax reports by mail and wire, in violation of 18 U.S.C. §§ 1341 and 1343. Ideal also asserted a state-law claim for breach of contract. The district court dismissed the RICO claims pursuant to Fed.R.Civ.P. 12(b)(6), ruling that the complaint did not state a claim under 18 U.S.C. § 1964(c) because it failed to allege the necessary causation, in that it did not, and could not, assert that the alleged misrepresentations had been relied on by Ideal. The court declined to exercise supplemental jurisdiction over the contract claim and dismissed that claim without prejudice. On appeal, Ideal contends that it adequately pleaded that its lost sales were

proximately caused by National's pattern of offering customers lower bottom-line cost by means of the unlawful omission of state sales tax and concealing those omissions by means of mail and wire fraud. For the reasons that follow, we agree.

## I. BACKGROUND

We summarize below the allegations of the amended complaint ("complaint"), the truth of which is assumed as is required on review of a Rule 12(b)(6) dismissal. We take those allegations, and the reasonable inferences that can be drawn from them, in the light most favorable to Ideal.

### A. *The Competitors*

Ideal is in the business of purchasing steel mill products from manufacturers outside of New York State and selling those products and related hardware and services to professional ironworkers, small steel fabricators, and do-it-yourself homeowners, for use in the New York, New Jersey, and Connecticut area. It has retail stores in Queens and the Bronx.

National, which is owned by defendants Joseph and Vincent Anza (collectively "the Anzas"), sells substantially the same products as Ideal to essentially the same customer base. National has retail outlets in Queens and the Bronx, located a few minutes' drive from Ideal's stores.

Ideal and National are the only substantial competitors in the Bronx or Queens for sales of the steel products they carry. No businesses in those areas other than Ideal and National carry "the same or a similar comprehensive array of products and services or compete for the same customers." (Complaint ¶ 3.) Given the similarity of their product lines (which comprise "generic commodities," *id.*) and the proximity of their retail outlets to each other in each Borough, Ideal and National compete against one another "primarily on the ba-sis of price" (Complaint ¶ 21); "differences in prices charged by Ideal and National affect customers' decisions to purchase from one or the *other*" (Complaint ¶ 22). Price fluctuation, however, does not affect overall demand for the products offered by Ideal and National; rather, overall demand is determined by "economic activity in the real estate and construction businesses" and other considerations beyond the control of National or Ideal. (*Id.*)

### B. *The Allegedly Fraudulent Scheme*

Under State law, Ideal and National are required to charge, collect, and remit to the State a combined state and local sales tax of 8¼ percent on any sale for which the customer does not qualify for an exemption. (*See* Complaint ¶¶ 23–25.) All sales are presumed by law to be taxable unless, within 90 days of purchase, the purchaser presents to the seller a valid resale or exemption certificate. (Complaint ¶ 23.)

Both Ideal and National conduct much of their business on a cash-and-carry basis. According to the complaint, Ideal complies with the state-law requirements that it charge and pay sales taxes, but National does not. The complaint alleged that, at the direction of the Anzas, National does not charge cash-paying non-exempt customers any sales tax; this allows those customers to save 8 ¼ percent on their purchases, thereby incurring a substantially lower bottom-line cost than they would incur by purchasing the same items from Ideal.

In order to maintain its profit margin while drawing customers away from Ideal with these unlawful "cash, no tax" sales, National, having refused to charge and collect the sales tax, simply does not pay the tax due on those sales. To conceal the amounts due, National has, since at least 1998, submitted fraudulent sales tax re-

ports to the State Tax Department, failing to report those sales and misrepresenting its total taxable sales. (Complaint ¶¶ 29–30.) National has filed the fraudulent reports, which are essential to the success of this scheme, by mail and wire, in violation of 18 U.S.C. §§ 1341 and 1343.

Ideal commenced the present action in 2002, alleging that National's "cash, no tax" sales, along with the necessary fraudulent reporting, were intended to and did injure Ideal's business. The complaint alleged that National's repeated fraudulent mailings and/or wire transmissions—on which the State Tax Department relied and continues to rely, enabling National to avoid paying sales tax on a significant portion of its taxable sales—constituted a pattern of racketeering activity that "continues to the present day." (Complaint ¶ 30.) Ideal alleged that its own list prices were, on average, no higher than those of National, and that but for defendants' "cash, no tax" scheme, National would have had no competitively significant price advantage over Ideal. The complaint alleged that as a result of the Anzas' operation of National through the above pattern of racketeering activity, in violation of RICO § 1962(c), Ideal had suffered "lost profits in an amount ... believed to exceed $5,000,000." (Complaint ¶ 51.)

In addition, the complaint alleged that the Anzas and National had violated RICO § 1962(a) by using profits gained from the "cash, no tax" scheme at National's Queens facility to open its outlet in the Bronx. (See Complaint ¶ 55.) That investment of racketeering income, along with defendants' implementation of the "'cash, no tax' scheme at that location" as well caused Ideal's Bronx outlet to "los[e] significant business and market share" (Complaint ¶ 57) resulting in damages in excess of $2,000,000 (see Complaint ¶ 58).

The complaint also alleged that defendants' "cash, no tax" scheme violated the terms of an agreement that had settled an earlier lawsuit between the parties. (Complaint ¶ 66.) The complaint requested treble damages on each RICO claim and single damages on the contract claim.

## C. The Decision of the District Court

Defendants moved to dismiss the complaint pursuant to, inter alia, Fed.R.Civ.P. 12(b)(6), arguing that Ideal lacked standing to bring its RICO claims because it had not adequately alleged that its injuries were proximately caused by defendants' alleged violations of § 1962. In a Decision and Order reported at 254 F.Supp.2d 464 (2003), the district court granted the motion, stating in part as follows:

Generally, to satisfy RICO's causation element a complaint must allege that a defendant's violation was both a "but for" or factual cause of plaintiff's injury and the proximate cause, as well. Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In complaints predicated on mail or wire fraud, a plaintiff must plead "'loss causation,' meaning that the misrepresentation must be both an actual and a proximate source of the loss that the plaintiffs suffered," Moore v. PaineWebber, Inc., 189 F.3d 165, 169–70 (2d Cir.1999), and "transaction causation," which requires a plaintiff to "demonstrate that [plaintiff] relied on [d]efendants' misrepresentations." Mezzonen, S.A. v. Wright, 97 CIV. 9380, 1999 WL 1037866, at *5 (S.D.N.Y. Nov.16, 1999); Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, 85 F.Supp.2d 282, 302 (S.D.N.Y.2000), aff'd 2 Fed. Appx. 109, 2001 WL 46565 (2d Cir. Jan.18, 2001); see also Moore, 189 F.3d at 171–72; Powers v. British Vita, P.L.C., 57 F.3d 176, 189 (2d Cir.1995) . . . .

254 F.Supp.2d at 467–68 (emphasis in original). The court ruled that Ideal had failed to plead transaction causation:

> Although Ideal alleges that the New York State Department of Taxation and Finance relied on Defendants' alleged misrepresentations (AC¶ 30), Ideal has not alleged—indeed can not allege—that Plaintiff relied on the sales tax returns Defendants mailed or wired to the New York State Department of Taxation and Finance. As a result, Ideal's RICO claims fail.

*Id.* at 468.

The court stated that although some RICO claims, such as those asserted in *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.*, 271 F.3d 374 (2d Cir.2001), are based on predicate acts that do not involve reliance, a RICO plaintiff must be able to show reliance—its own reliance—when the alleged racketeering activity on which its RICO claim is based is mail fraud or wire fraud. *See id.* at 468–69.

Having concluded that Ideal's RICO claims must be dismissed pursuant to Rule 12(b)(6), the court declined to exercise supplemental jurisdiction over Ideal's contract claim, and it dismissed that claim without prejudice. Judgment was entered accordingly, and this appeal followed.

## II. DISCUSSION

■ On appeal, Ideal contends that, despite the fact that it did not itself rely on National's mail and wire frauds, it has standing to assert its civil RICO claims because it alleged facts sufficient to show that injury to its business was proximately caused by National's pattern of racketeering activity and investment of racketeering income. Because the complaint alleges that Ideal was a competitor of National and was an entity directly targeted for injury by National's racketeering activity, we agree.

### A. Mail and Wire Fraud Racketeering Activity

RICO authorizes a private right of action for treble damages by a "person injured in his business or property by reason of a violation of section 1962 of [Title 18]." 18 U.S.C. § 1964(c). Section 1962 provides, in pertinent part, that

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in ... the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce,

18 U.S.C. § 1962(a), and that

> [i]t shall be unlawful for any person ... associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity,

*id.* § 1962(c).

RICO defines racketeering activity to include mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1). The mail and wire fraud statutes prohibit the use of those means of communication in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. The mailing of false state sales tax returns may constitute mail fraud in violation of § 1341. *See, e.g., United States v. Porcelli*, 865 F.2d 1352, 1360–61 (2d Cir.), *cert. denied*, 493 U.S.

810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); *see also United States v. Slevin,* 106 F.3d 1086, 1088 (2d Cir.1996) ("Because the[ mail and wire fraud] statutes use the same relevant language, they are analyzed in the same way.").

Generally, two or more related acts of racketeering activity may be considered a "pattern" of racketeering activity. *See* 18 U.S.C. § 1961(5); *United States v. Indelicato,* 865 F.2d 1370, 1381–84 (2d Cir.) (en banc), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989).

## B. *Civil RICO Claims and Proximate Causation*

 The requirement in § 1964(c) that a civil RICO plaintiff show that it was injured in its business or property "by reason of" the defendant's RICO violation means that the plaintiff must plead and prove that the violation not only was the logical, or "but for," cause of the injury but also was its legally cognizable, or proximate, cause. *See, e.g., Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *Baisch v. Gallina,* 346 F.3d 366, 372 (2d Cir.2003); *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 123 (2d Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003); *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.,* 271 F.3d 374, 380 (2d Cir. 2001) ("*Commercial Cleaning* "); *In re American Express Co. Shareholder Litigation,* 39 F.3d 395, 399 (2d Cir.1994) ("*American Express* ").

> "Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.'"

*Lerner v. Fleet Bank, N.A.,* 318 F.3d at 123 (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994) (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23–24 (2d Cir.1990)), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995)).

> The requirement that a defendant's actions be the proximate cause of a plaintiff's harm represents a policy choice premised on recognition of the impracticality of asserting liability based on the almost infinite expanse of actions that are in some sense causally related to an injury. *See Sperber v. Boesky,* 849 F.2d 60, 63 (2d Cir.1988). In marking that boundary, the Supreme Court has emphasized that a plaintiff cannot complain of harm so remotely caused by a defendant's actions that imposing legal liability would transgress our "ideas of what justice demands, or of what is administratively possible and convenient."

*Commercial Cleaning,* 271 F.3d at 380 (quoting *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311 (other internal quotation marks omitted)).

### 1. *Operating an Enterprise in Violation of § 1962(c)*

Applying these principles to claims that the affairs of a RICO enterprise have been conducted in violation of subsection (c) of § 1962, we have upheld dismissals of a variety of civil RICO complaints where the alleged injury was too remote from the alleged racketeering activity. For example, in *Sperber v. Boesky,* 849 F.2d 60 (2d Cir.1988), the plaintiffs sought damages from a defendant convicted of insider trading in certain stocks, alleging that the plaintiffs lost money investing in other companies in which the defendant was a also shareholder. Plaintiffs' theory was that the defendant's reputation as a suc-

cessful investor—gained as a result of his pattern of insider trading—had artificially inflated the prices of the stocks purchased by the plaintiffs. The complaint alleged that the plaintiffs suffered investment losses as the prices of those shares fell following the defendant's conviction for insider trading. *See id.* at 62. We affirmed the Rule 12(b)(6) dismissal because the alleged injuries were too remote from the defendant's unlawful activity.

In *Hecht v. Commerce Clearing House, Inc.*, the plaintiff brought a civil RICO action against his former employer and co-workers, alleging that they had implemented a scheme to defraud customers in violation of the mail fraud and wire fraud statutes. The plaintiff alleged that he had been injured by the fraudulent scheme both because clients whom he had serviced had discovered the frauds and ceased to do business with his employer, thereby costing him commissions he would have otherwise earned, and because he had been fired for refusing to participate in the frauds. *See* 897 F.2d at 22–24. We upheld the district court's dismissal of the plaintiff's claims, explaining that the plaintiff was " 'neither the target of the racketeering enterprise nor the competitor[ ] nor the customer[ ] of the racketeer[s],' " and that the plaintiff's injuries, as a result, were not "reasonably foreseeable ... natural consequence[s] of the RICO violations" for purposes of § 1964(c). *Id.* at 24 (quoting *Sperber v. Boesky,* 849 F.2d at 65).

In *Lerner v. Fleet Bank, N.A.*, the plaintiffs, who had invested with an attorney who absconded with their money, brought civil RICO claims against the banks in which their funds had been deposited. The plaintiffs claimed that the banks had engaged in racketeering activity, to wit, mail and wire fraud, by sending back to various payees bounced checks that the banks stamped "refer to maker," rather than "insufficient funds"; telling some payees that their checks had been dishonored because of a computer error or because the check had been written on the wrong account, rather than because the attorney had insufficient funds; and sending statements to the attorney that did not mention the dishonored checks. *See* 318 F.3d at 119. The plaintiffs alleged that the banks also failed to report the attorney's overdrafts and other defaults to state disciplinary authorities, which would have caused the attorney to be disbarred and thereby led the plaintiffs to discontinue their investments with him. We held that the connection between the plaintiffs' injuries and the banks' mailings, which obscured the attorney's criminal behavior, was far too attenuated to meet the requirement of proximate cause and that the complaint thus failed to state a civil RICO claim. *See id.* at 122–24.

In *American Express,* we upheld the Rule 12(b)(6) dismissal of a derivative action complaint by shareholders of American Express alleging that company officials had committed mail and wire frauds and repeated acts of bribery in an effort to defame one Edmond J. Safra, an American Express competitor. *See* 39 F.3d at 396–98. When the fraudulent acts were discovered, American Express was injured by, *inter alia,* losing business and goodwill and having to pay millions of dollars in legal fees and settlements. We upheld the dismissal of the complaint because the alleged injuries to the company were not proximately caused by the racketeering activities of fraud and bribery but rather were caused by the fact that those activities did not have their intended effect and were discovered by their intended target. The target of the unlawful acts was Safra, not American Express; the "RICO defendants' scheme [w]as 'an illicit scheme to injure a potential major competitor of

[American Express].' " *Id.* at 400 (quoting the plaintiffs' brief on appeal).

The injuries alleged thus were neither the "preconceived purpose" nor the "specifically-intended consequence" of the RICO defendants' acts. Moreover, any losses to American Express were caused only because the scheme itself was exposed and thus failed. Therefore, the harm to American Express was neither the "necessary result" of the scheme nor ... "foreseeable" ....

*Id.*

We reached a similar result in *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234 (2d Cir.), *cert. denied,* 519 U.S. 816, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996), in which the defendant advertising agency had paid nearly $1 million to two individual defendants who informed it, falsely, that Abrahams, then a Jamaican tourism official, could be bribed to grant the agency the Jamaican Tourism Board ("JTB") advertising business. Although none of the bribery money was ever given to Abrahams, he was indicted along with the scheme's participants. After the charges against him were dropped, Abrahams brought a civil RICO action alleging "injuries to his reputation and to his emotional, financial, political, and social status resulting from widespread public dissemination of false information about his role in the bribery scheme." *Id.* at 236. We noted, however, that "Abrahams was neither an intended target of the scheme nor an intended beneficiary of the laws prohibiting it." *Id.* at 238. Nor was he injured by the scheme itself; rather, "Abrahams was injured ... by the fallout from the scheme's exposure." *Id.* at 239. We thus upheld the dismissal of Abrahams's complaint for failure to state a civil RICO claim on the ground that his injuries were not sustained "by reason of" the agency's racketeering activity within the meaning of § 1964(c).

In *Baisch v. Gallina,* in contrast, we reversed the grant of summary judgment dismissing the civil RICO claims asserted by a plaintiff lender against insurance brokers and an operator of Raycon Construction Co. ("Raycon"), a company that, in order to do business with Nassau County, was required "to provide the County with estimates of the number and type of workers needed for each project, along with the number of hours to be worked and the hourly rate per worker." 346 F.3d at 369. The complaint alleged that "the defendants engaged in a pattern of racketeering activity by causing Raycon to submit to Nassau County fraudulent documents, including inflated estimates and falsified claim vouchers." *Id.* Baisch entered into a factoring agreement with Raycon and lost money when Raycon submitted the fraudulent vouchers—and other vouchers not even submitted to the County—to him, and he advanced funds based on those fraudulent vouchers. The district court ruled that Baisch lacked standing to bring a civil RICO claim because the party directly injured by the alleged racketeering activity would have been the County. We disagreed with the premise that only one category of victim has standing to bring a civil RICO claim. We noted that the foreseeability component of proximate cause is established where the plaintiff was a "target[ ]" and "intended victim[ ] of the racketeering enterprise," *id.* at 374 (internal quotation marks omitted), even if he was not the primary target or victim, and that "[n]o precedent suggests that a racketeering enterprise may have only one 'target,' or that only a primary target has standing," *id.* at 375. We noted that the frauds on Baisch and the County were intertwined, and we held that Baisch had standing to pursue a RICO claim based in part on the false vouchers submitted to the County because "[t]he defendants specifically targeted [him] as their victim alleged-

ly by taking his loans under false pretenses and consciously creating a high risk of defaulting on those loans." *Id.*

In each of the above cases in which we approved the summary dismissal of the complaint, we noted that the plaintiffs were not competitors of the racketeering enterprise or targets of alleged racketeering activity. *See, e.g., Lerner v. Fleet Bank, N.A.,* 318 F.3d at 124 ("[W]e have repeatedly emphasized that the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise."); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d at 24 (plaintiff was "neither the target of the racketeering enterprise nor the competitor[ ] ... of the racketeer[s]" (internal quotation marks omitted)); *Sperber v. Boesky,* 849 F.2d at 65 (plaintiffs were "neither the target of the racketeering enterprise nor the competitors nor the customers of the racketeer"). The view that a competitor alleging injury to its business resulting from racketeering activity of a defendant competitor adequately pleads proximate cause within the meaning of § 1964(c) is consistent with the Supreme Court's decision in *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In *Sedima,* a divided Court ruled that a civil RICO plaintiff, who had alleged predicate acts of mail and wire fraud, could recover damages not only for "racketeering injury," but also for injury caused directly by RICO predicate acts. *See id.* at 495–96, 105 S.Ct. 3275. Although the Court was divided on that issue, all members were in agreement that the principal persons for whose benefit the RICO private right of action was created included a defendant's "competitors ... whose businesses and interests are harmed ... or whose competitive positions decline because of infiltration in the relevant market," or who could

"plead and prove that they suffered ... injury to their competitive, investment, or other business interests resulting from the defendant's conduct of a business ... through a pattern of racketeering activity," 473 U.S. at 519–20, 105 S.Ct. 3275 (Marshall, J., dissenting); *see* 473 U.S. at 497 n. 15, 105 S.Ct. 3275 (majority opinion, stating that damages recoverable under RICO "include, but are not limited to, the sort of competitive injury for which the dissenters would allow recovery").

In *Commercial Cleaning,* we reversed the Rule 12(b)(6) dismissal of a civil RICO complaint alleging that the plaintiff's competitor had engaged in a pattern of racketeering activity, to wit, knowingly hiring undocumented aliens in violation of 8 U.S.C. § 1324(a), which "enabled [the defendant] to lower its variable costs and thereby underbid competing firms, which consequently lost contracts and customers to [the defendant]." 271 F.3d at 378. We noted that the plaintiff was

> not alleging an injury that was derivative of injury to others. Commercial does not seek to recover based on the misfortunes visited upon a third person by the defendant's acts.... It claims to have lost profits directly as the result of [the defendant's] underbidding, which it achieved through its violation of § 1324(a). *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1343 (2d Cir. 1994) (holding that the value of business opportunities lost due to defendant's RICO violations is compensable); *Mid Atlantic Telecom Inc. v. Long Distance Servs., Inc.,* 18 F.3d 260, 264 (4th Cir. 1994) (noting that plaintiff was not seeking to vindicate claims of customers who accepted defendant's fraudulent, ostensibly lower rates, but rather alleged "distinct and independent injuries: lost customers and lost revenues") .... We have stated a plaintiff has standing where the plaintiff is the direct target of

the RICO violation. *See Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 238 (2d Cir.1996); *American Express*, 39 F.3d at 400 (targets of RICO violations were competitive rivals not shareholders harmed by decrease in stock value upon exposure of scheme); *see also Mid Atlantic Telecom*, 18 F.3d at 263 (plaintiff has standing if it can show that it was a "direct target" of defendant's RICO violations). As discussed above, the theory of Commercial's claim is that Colin undertook the illegal immigrant hiring scheme in order to undercut its business rivals, thus qualifying them as direct targets of the RICO violation.

*Commercial Cleaning*, 271 F.3d at 384 (internal quotation marks omitted).

In the present case, the district court viewed our holding in *Commercial Cleaning* as inapposite here because the predicate acts alleged in that case were not frauds. We disagree with the court's conclusion. As revealed in the above quotation, *Commercial Cleaning* itself relied in part on the reasoning of cases such as *Abrahams v. Young & Rubicam Inc.* and *American Express*, in which the alleged predicate racketeering activities included acts of fraud. In particular, we cited with approval *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260 (4th Cir.) ("*Mid Atlantic*"), *cert. denied*, 513 U.S. 931, 115 S.Ct. 323, 130 L.Ed.2d 283 (1994), in which the Fourth Circuit held that a competitor had standing to bring a civil RICO claim where the only racketeering activities alleged were mail frauds in communications from the defendants to the plaintiff's customers. In that case, Mid Atlantic Telecom, Inc. ("Mid Atlantic"), and defendant Long Distance Services, Inc. ("LDS"), were resellers of long-distance telecommunications services competing for the same customers. The complaint alleged that the defendants had engaged in a pattern of fraudulent mailings, soliciting customers by offering them artificially low rates, lower than Mid Atlantic's basic rates, forcing Mid Atlantic to meet the apparently lower LDS rates. However, "[i]n practical effect, ... the quoted [LDS] rates were not [as] low[ as had been represented], since additional minutes were randomly and artificially added [by the defendants] to the lengths of telephone calls" made by LDS customers. *Mid Atlantic*, 18 F.3d at 261. The defendants contended that "Mid Atlantic d[id] not allege that it received mail or telephone solicitations offering artificially low rates, merely that its customers did"; that, therefore, defendants' "customers were the only victims of the alleged fraud"; and hence "the [defendants'] solicitations could not have been the proximate cause of Mid Atlantic's injuries." *Id.* at 263. The Fourth Circuit rejected these contentions and vacated the summary dismissal of the complaint, noting that Mid Atlantic was "not seeking [either] to vindicate the rights of its former customers who may have been offered fraudulently low rates" or to recover for injuries "derivative of any losses suffered by its former customers." *Id.* at 264. Rather, "Mid Atlantic alleges that LDS engaged in fraudulent use of the mails and telephone wires to entice customers away from Mid Atlantic and to eliminate Mid Atlantic as a competitor." *Id.* at 263. The court recognized that there may be more than one category of victims to whom a defendants' conduct can proximately cause injury, and that although the customers may have been the most direct victims of the defendants' alleged frauds, Mid Atlantic "claim[ed] distinct and independent injuries: lost customers and lost revenue due to the necessity of offering lower rates to match [the defendants'] fraudulent ones." *Id.* at 264.

... Mid Atlantic may be able to show that while the scheme was initially aimed only at defrauding LDS customers, [the individual defendant] broadened the sweep of the intrigue to include Mid Atlantic as a direct target (i.e., to obtain an unfair competitive advantage in recruiting Mid Atlantic customers). *Id.* at 263.

The *Mid Atlantic* holding that a civil RICO plaintiff might prevail by establishing that his injury was proximately caused by a defendant's mail frauds that were relied on by a third person is consistent with the view that this Court had adopted in *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir. 1990) (*"LILCO"*). In *LILCO*, the County of Suffolk had asserted a civil RICO claim alleging that defendants Long Island Lighting Company (*"LILCO"*) and its officers committed mail fraud in the course of State Public Service Commission ("PSC") proceedings, inducing the PSC to grant LILCO unwarranted and excessive rate increases. Although we upheld the post-trial dismissal of that claim for lack of proof that the rate increases were in fact caused by the alleged frauds, we plainly accepted the principle that a RICO claim based on mail fraud may be proven where the misrepresentations were relied on by a third person, rather than by the plaintiff. Noting that the "by reason of" phrase in § 1964(c) "requires that there be a causal connection between the prohibited conduct and plaintiff's injury," 907 F.2d at 1311, and citing, *inter alia, Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969 (S.D.N.Y. 1989) (*"Shaw"*), we stated that

[i]n the context of this case, which involves RICO mail fraud claims, this means that it was necessary for *Suffolk* to demonstrate at trial that LILCO's misrepresentations to the PSC *were relied upon by the PSC,* ... and that such

misrepresentations caused LILCO's rate increases to be granted.

*LILCO*, 907 F.2d at 1311 (emphases added). Although we ultimately found the trial evidence insufficient, we plainly adopted the principle stated in *Shaw* that "[a] plaintiff who is injured as a proximate result of fraud should be able to recover regardless of whether he or a third party is the one deceived," 726 F.Supp. at 973.

Although cases such as *United States v. Evans*, 844 F.2d 36 (2d Cir.1988) (*"Evans"*), *Corcoran v. American Plan Corp.*, 886 F.2d 16 (2d Cir.1989) (*"Corcoran"*), and *Metromedia Co. v. Fugazy*, 983 F.2d 350 (2d Cir.1992) (*"Metromedia"*), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), have sometimes been cited for the proposition that a civil RICO claim based on mail or wire fraud cannot be established absent proof that the plaintiff itself relied on the misrepresentation, *see, e.g., Corcoran*, 886 F.2d at 21 (discussing a possible need for "convergence of the deceived and the injured"), none of those cases held that the plaintiff's own reliance was required. The *Evans* and *Corcoran* cases, which were decided under the then-prevailing *McNally* principle that fraudulent mailings did not violate § 1341 unless the scheme was designed to deprive the victim of money or property, *see McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), *superseded by statute*, 18 U.S.C. § 1346, discussed the convergence theory but did not turn on reliance at all. They held that the government in *Evans* and the plaintiff New York State Superintendent of Insurance in *Corcoran* could not show that they had been deprived of money or property and hence had not even alleged RICO predicate acts. And in *Metromedia*, we stated that "the plaintiff was required to demonstrate that the defendant's misrepresentations *were relied on*," 983 F.2d at 368 (emphasis add-

ed), without suggesting a limitation as to what entity's reliance would suffice, and we cited *LILCO,* 907 F.2d at 1311, which, as discussed above, plainly indicated that a plaintiff who is injured as a proximate result of fraud should be able to recover regardless of whether it was the plaintiff or a third party that was deceived. This Court has not held that the civil-RICO plaintiff who alleges mail fraud or wire fraud must have been the entity that relied on the fraud.

The principle that a plaintiff who is injured as a proximate result of RICO predicate acts of fraud need not prove his own reliance, rather than that of a third party, was also approved in our discussion in *American Express,* in which we ruled that American Express shareholders lacked standing to bring derivative civil RICO claims for losses the company incurred in connection with its mail fraud, wire fraud, and bribery-based efforts to defame Safra. Although Safra himself plainly could not have relied on the frauds, we stated that

> [i]f appellants are correct that [individual defendants] violated RICO by defaming Safra, then Safra, as the target and victim of the scheme, could sue [them] under RICO and recover treble damages for injuries to his "business or property." *See* 18 U.S.C. § 1964(c).

*American Express,* 39 F.3d at 401.

In dismissing Ideal's complaint in the present case on the ground that a civil RICO plaintiff who alleges predicate acts of mail or wire fraud has not adequately pleaded transaction causation unless he has alleged that he himself relied on the fraudulent communications, the district court instead relied principally on our decisions in *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169–72 (2d Cir.1999), and *Powers v. British Vita, P.L.C.,* 57 F.3d 176, 189 (2d Cir.1995). Although those cases contained such language, that language was used in the context of claims brought by plaintiffs who themselves were parties to the transactions that they claimed had been fraudulently induced. In such cases, *i.e.,* where the plaintiff alleges that he was the person deceived, the transaction causation test is not an independent standing requirement but is merely shorthand for part of the normal causation analysis. *Moore* and *Powers* did not deal with circumstances such as those here, in which a plaintiff claims to have been directly harmed by means of a fraud perpetrated on another person, and their statements that the plaintiff must show his own reliance do not control the proximate cause analysis here.

Rather, the principle governing the present case is that where a complaint contains allegations of facts to show that the defendant engaged in a pattern of fraudulent conduct that is within the RICO definition of racketeering activity and that was intended to and did give the defendant a competitive advantage over the plaintiff, the complaint adequately pleads proximate cause, and the plaintiff has standing to pursue a civil RICO claim. This is so even where the scheme depended on fraudulent communications directed to and relied on by a third party rather than the plaintiff.

In the present case, Ideal alleged facts sufficient to show that its claimed loss of business was proximately caused by defendants' operation of National's stores through a pattern of racketeering activity. According to the complaint, described in Parts I.A. and B. above, defendants' "cash, no tax" scheme was implemented for the purpose of diverting customers from Ideal, which collected the sales taxes required by law, to National, which did not. Given that Ideal and National sell substantially the same products and that their retail stores are but minutes apart, the lower bottom-line cost available to cash purchas-

ers from National as a result of not paying sales tax influenced some customers to purchase from National rather than from Ideal.

Defendants' mailings or electronic transmissions of fraudulent sales tax reports to the State Tax Department were an essential part of the "cash, no tax" scheme, for without the fraudulent reports, and the State's reliance on them, defendants would have had to pay the uncollected sales taxes out of their own assets. The principal intended victim of the scheme was Ideal, over which defendants sought to secure a competitive advantage by giving certain cash customers an unlawful benefit, and by concealing that unlawful conduct and retaining the resulting profits by means of racketeering activity. Accordingly, we conclude that Ideal, as a competitor directly targeted by defendants for competitive injury, has standing to assert its RICO claims against defendants for violations of § 1962(c) based on the alleged predicate acts of mail and wire fraud.

### 2. *Investing Racketeering Income in Violation of § 1962(a)*

Given the facts alleged in the complaint, we also conclude that Ideal has standing to assert its § 1962(a) claim. A plaintiff may state a civil RICO claim for violation of subsection (a) by alleging that a defendant has received "income derived, directly or indirectly, from a pattern of racketeering activity" and has "use[d] or invest[ed]" any part of that income "directly or indirectly" in an enterprise engaged in interstate commerce, 18 U.S.C. § 1962(a). Under that section, the complaint "must allege injury 'by reason of defendants' investment of racketeering income in an enterprise," as distinct from injury traceable simply to the predicate acts of racketeering alone or to the conduct of the business of the enterprise. *See*

*Ouaknine v. MacFarlane*, 897 F.2d 75, 82–83 (2d Cir.1990).

Here, part of the proceeds of defendants' alleged "cash, no tax" scheme may properly be viewed as racketeering income, indirectly derived from their pattern of mail and wire frauds, given that those frauds enabled defendants to avoid paying 8¼ percent of those proceeds to the State. And the complaint alleges that defendants used profits gained from the operation of their "cash, no tax" scheme at National's Queens location to fund the opening of their retail outlet in the Bronx near Ideal's outlet in that Borough. The complaint adequately stated a claim on which relief can be granted under § 1964(c) for a violation of § 1962(a).

### C. *Defendants' Alternative Arguments for Affirmance*

We also reject defendants' contentions that the dismissal of the complaint may be upheld on either of two alternative grounds. First, they contend that we should affirm because the problems of proof inherent in Ideal's theory of causation are intractable, as its business losses may have resulted from any of a number of economic factors unrelated to National's alleged practice of failing to charge and pay sales tax. (*See* Defendants' brief on appeal at 20–22.) The evidentiary difficulty hypothesized by defendants, however, is not a proper basis for a dismissal pursuant to Rule 12(b)(6) for failure to state a claim. *See e.g., Commercial Cleaning*, 271 F.3d at 382–83; *see also Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (potential difficulty in establishing "chain of causation .... is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss").

Second, defendants argue that the judgment of the district court should

be affirmed because Ideal failed to allege that defendants' electronic filings were interstate, a jurisdictional element of the wire fraud offense described in § 1343. *See generally Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 243 (2d Cir.1999) (a § 1343 offense "requires that the defendant communicate by wire in 'interstate or foreign commerce'"; a "[p]urely intrastate communication [is] beyond the statute's reach" (other internal quotation marks omitted)). Defendants argue that because National is located in New York and the allegedly false tax reports were filed within the State, National's electronic tax filings cannot have violated the wire fraud statute. This contention is both substantively and procedurally flawed. As a matter of substance, it is possible for a wire communication whose origin and ultimate destination are within a single state to be routed through another state. *See, e.g., United States v. Davila,* 592 F.2d 1261, 1263 (5th Cir.) (upholding § 1343 wire fraud conviction of a defendant who used Western Union wire transfers to send money between San Antonio and McAllen, Texas, which were routed through Middletown, Virginia), *reh'g denied,* 597 F.2d 283, *cert. denied,* 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 56 (1979); *see also United States v. Blassingame,* 427 F.2d 329, 330 (2d Cir.1970) (defendant need not know that its wire communication travels through interstate commerce for § 1343 to be applicable), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971). As a matter of procedure, the question of whether Ideal will be able to prove that pertinent wire communications by defendants traveled interstate is a matter for trial, not for resolution on a motion pursuant to Rule 12(b)(6). Further, even if it were clear that defendants' wire transmissions were purely intrastate, that would not warrant dismissal of the complaint, for the complaint alleges not only wire fraud but mail fraud. There is no requirement that mail travel, interstate for its sender to violate § 1341. *See, e.g., United States v. Gil,* 297 F.3d 93, 99–100 (2d Cir.2002).

## CONCLUSION

We have considered all of defendant's arguments in support of affirmance and have found them to be without merit. The judgment dismissing the RICO claims is vacated for the reasons stated above. We also vacate the dismissal of the state-law contract claim, over which the district court declined to exercise supplemental jurisdiction because of its dismissal of the RICO claims. The matter is remanded for further proceedings not inconsistent with this opinion.