09-3212-cv
Corp. v. Anza

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued: June 9, 2010          Decided: June 28, 2011)

Docket No. 09-3212-cv

_____

IDEAL STEEL SUPPLY CORPORATION,

                              Plaintiff-Appellant,

                     - v. -

JOSEPH ANZA, VINCENT ANZA and NATIONAL STEEL SUPPLY, INC.,

                              Defendants-Appellees.

_____

Before:  KEARSE, WALKER, and CABRANES, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Richard M. Berman, Judge, dismissing, for lack of proximate cause, a civil RICO claim that plaintiff lost business as a result of defendants' investment of funds, derived from a pattern of racketeering activity, in the establishment and operation of a commercial enterprise in competition with plaintiff's business, see 18 U.S.C. §§ 1962(a), 1964(c).

Vacated and remanded.

Judge Cabranes dissents, in a separate opinion.

SCOTT A. MOSS, Denver, Colorado (Moss Law Practice, Denver, Colorado, on the brief), for Plaintiff-Appellant.

WILLIAM M. BRODSKY, New York, New York (JooYun Kim, Fox Horan & Camerini, New York, New York, on the brief), for Defendants-Appellees.

KEARSE, Circuit Judge:

This case returns to us from the United States District Court for the Southern District of New York, Richard M. Berman, Judge, following the entry of a final judgment dismissing the third amended complaint (or "Complaint") of plaintiff Ideal Steel Supply Corporation ("Ideal") under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, which principally alleged injury to Ideal's business by reason of defendants' establishment of a competing commercial enterprise through the investment of income derived from a pattern of racketeering activity--to wit, mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, in the filing of fraudulent tax returns and related information enabling the evasion of more than $1 million in income taxes--in violation of 18 U.S.C. § 1962(a). The district court granted defendants' motions for judgment on the pleadings, and in the alternative for summary judgment, on the grounds that the Complaint and the record were insufficient to show that any injury to Ideal's business was proximately caused by defendants' alleged violation of § 1962(a). For the reasons that follow, we vacate and remand for trial.

- 2 -

# I. BACKGROUND

Much of the factual background of this litigation is described in prior opinions, familiarity with which is assumed. See Ideal Steel Supply Corp. v. Anza, 254 F.Supp.2d 464, 465-66 (S.D.N.Y. 2003) ("Ideal Steel I"), vacated and remanded, 373 F.3d 251, 253-56, 265 (2d Cir. 2004) ("Ideal Steel II"), reversed in part, and vacated and remanded in part, 547 U.S. 451, 453-56, 462 (2006) ("Ideal Steel III"). For purposes of this appeal from the granting of judgment on the pleadings and summary judgment against Ideal, we take the allegations of the Complaint as true, and we summarize the record in the light most favorable to Ideal.

## A. The Parties and the Initial Claims: Ideal I and II

Ideal operates a retail business in the New York City boroughs of Queens and the Bronx, selling steel mill products and related hardware and services to professional ironworkers, small steel fabricators, and do-it-yourself homeowners in the New York, New Jersey, and Connecticut area. Defendant National Steel Supply, Inc., is owned by defendants Joseph and Vincent Anza (collectively "the Anzas") and is Ideal's competitor. National operates two retail outlets, one in Queens and one in the Bronx, each located a few minutes' drive from the Ideal store in that borough. Ideal and National sell substantially the same products to essentially the same customer base.

Ideal commenced the present action in 2002, principally asserting two civil RICO claims. First, it asserted a claim against the Anzas, alleging that they had conducted, or participated in the conduct of, the affairs of an interstate-business enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Ideal alleged that, since at least 1998, National at its Queens store, at the direction of the Anzas, had engaged in a pattern of racketeering activity by (a) not charging sales tax to any customers who paid for their purchases in cash (the "cash-no-tax" scheme), thereby violating state laws that required merchants to charge and collect such taxes, and (b) then submitting, by mail and wire, fraudulent sales and income tax reports and returns that concealed National's cash sales and misrepresented its total taxable sales, thereby evading substantial sums in income tax. Ideal alleged that by engaging in the cash-no-tax scheme through a pattern of mail and wire frauds in violation of § 1962(c), National injured Ideal's business by luring away customers who chose to buy from National simply in order to save more than eight percent on their purchases by not paying the required sales tax.

Second, Ideal alleged that in 1999 and 2000, the Anzas and National, in violation of § 1962(a), invested funds derived from National's Queens store's cash-no-tax scheme to establish National's store in the Bronx. The opening of that facility caused Ideal to lose a substantial amount of business at its Bronx store. Ideal also asserted a state-law claim for breach of an

- 4 -

agreement that had settled prior litigation between Ideal and National.

In Ideal I, the district court dismissed Ideal's federal claims pursuant to Fed. R. Civ. P. 12(b)(6). Citing Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 265-68 (1992), the court noted that, in order to prevail on a civil RICO claim, the plaintiff must allege that a defendant's RICO violation was not only a "but for" cause of plaintiff's injury but also its proximate cause. Citing, inter alia, Moore v. PaineWebber, Inc., 189 F.3d 165, 169-70 (2d Cir. 1999) ("Moore"), and Powers v. British Vita, P.L.C., 57 F.3d 176, 189 (2d Cir. 1995) ("Powers"), the district court stated that

> [i]n complaints predicated on mail or wire fraud, a plaintiff must plead "loss causation," meaning that the misrepresentation must be both an actual and a proximate source of the loss that the plaintiffs suffered, . . . and "transaction causation," which requires a plaintiff to demonstrate that [plaintiff] relied on [d]efendants' misrepresentations,

Ideal I, 254 F.Supp.2d at 468 (emphasis in original) (other internal quotation marks omitted), and that a civil RICO plaintiff claiming injury to its business from racketeering activity in the nature of fraud cannot show proximate cause without demonstrating that the plaintiff itself relied on the fraudulent communications, see id. The court concluded that

> [a]lthough Ideal alleges that the New York State Department of Taxation and Finance relied on Defendants' alleged misrepresentations . . . , Ideal has not alleged--indeed, can not allege--that Plaintiff relied on the sales tax returns Defendants mailed or wired to the New York State Department of Taxation and Finance. As a result, Ideal's RICO claims fail.

- 5 -

Id. The court declined to exercise supplemental jurisdiction over Ideal's breach-of-contract claim.

In Ideal II, this Court vacated the Ideal I decision, noting that although there was language in Moore and Powers to the effect that a plaintiff itself must have relied on the allegedly fraudulent racketeering activity, those cases dealt with claims of plaintiffs who alleged that they were in fact parties to the transactions that they claimed had been fraudulently induced. See Ideal II, 373 F.3d at 263. Thus, the language as to the need for reliance by the plaintiff itself was descriptive rather than normative. See id. We observed that "[t]his Court has not held that the civil-RICO plaintiff who alleges mail fraud or wire fraud must have been the entity that relied on the fraud," id.

Focusing principally on Ideal's claim under § 1962(c), we saw a critical distinction between that claim and the claims asserted in cases in which we had affirmed Rule 12(b)(6) dismissals of civil RICO claims for insufficient allegation of proximate cause. Those prior cases had involved claims of injury that were too remote from the alleged racketeering activity because, for example, the plaintiff's injuries were not "'reasonably foreseeable'" or the "'natural consequence[s] of the RICO violations,'" Ideal II, 373 F.3d at 258 (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 24 (2d Cir. 1990)); or the plaintiff was "'neither the target of the racketeering enterprise nor the competitor[] nor the customer[] of the racketeer[s],'" Ideal II, 373 F.3d at 258 (quoting Sperber v.

Boesky, 849 F.2d 60, 65 (2d Cir. 1988)); or the injury sued for was neither the "'preconceived purpose'" nor the "'specifically-intended consequence'" of the RICO defendants' racketeering activity, Ideal II, 373 F.3d at 259 (quoting In re American Express Co. Shareholder Litigation, 39 F.3d 395, 400 (2d Cir. 1994)). We concluded that even if an alleged scheme depended on fraudulent communications directed to and relied on by a third person rather than by the plaintiff, a plaintiff injured in its business or property has standing to pursue a civil RICO claim-- and adequately pleads proximate cause--if its

> complaint contains allegations of facts to show that the defendant engaged in a pattern of fraudulent conduct that is within the RICO definition of racketeering activity and that was intended to and did give the defendant a competitive advantage over the plaintiff.

Ideal II, 373 F.3d at 263. Noting the allegations that

> [t]he principal intended victim of the scheme was Ideal, over which defendants sought to secure a competitive advantage by giving certain cash customers an unlawful benefit, and by concealing that unlawful conduct and retaining the resulting profits by means of racketeering activity,

id. at 264 (emphasis added), we concluded that

> Ideal, as a competitor directly targeted by defendants for competitive injury, has standing to assert its RICO claims against defendants for violations of § 1962(c) based on the alleged predicate acts of mail and wire fraud,

id. We concluded that Ideal's complaint adequately stated claims under both § 1962(c) and § 1962(a).

B. The Decision of the Supreme Court: Ideal III

In Ideal III, 547 U.S. 451, the Supreme Court reversed in part, and vacated and remanded in part, our decision in Ideal II. With respect to Ideal's claim under § 1962(c), the Court reversed, noting its holding in Holmes "that a plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury," Ideal III, 547 U.S. at 453, and stating that the critical question for the present case was thus "whether the alleged violation led directly to the plaintiff's injuries," not whether the violation intentionally targeted the plaintiff, id. at 460-61. RICO provides a civil right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962," 18 U.S.C. § 1964(c). The Holmes Court had rejected the proposition that the phrase "by reason of" required merely that the claimed violation have been a "but for" cause of the plaintiff's injury, concluding instead that that phrase "'demand[s] . . . some direct relation between the injury asserted and the injurious conduct alleged.'" Ideal III, 547 U.S. at 457 (quoting Holmes, 503 U.S. at 268). With respect to a claimed violation of § 1962(c), which prohibits conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity, the Court had

> indicated the compensable injury flowing from a violation of that provision "necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise."

*Ideal III*, 547 U.S. at 457 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) ("*Sedima*")).

The Supreme Court found it clear that there was no direct relation between the injury asserted by Ideal and the Anzas' alleged mail and wire frauds:

> The RICO violation alleged by Ideal is that the Anzas conducted National's affairs through a pattern of mail fraud and wire fraud. The direct victim of this conduct was the State of New York, not Ideal. It was the State that was being defrauded and the State that lost tax revenue as a result.
>
> The proper referent of the proximate-cause analysis is an alleged practice of conducting National's business through a pattern of defrauding the State. To be sure, Ideal asserts it suffered its own harms when the Anzas failed to charge customers for the applicable sales tax. The cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State).

*Ideal III*, 547 U.S. at 458 (emphases added).

The Court noted that one of the reasons for the directness requirement is that "'[t]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.'" *Id*. at 458 (quoting *Holmes*, 503 U.S. at 269). It found Ideal's § 1962(c) claim "illustrative":

> The injury Ideal alleges is its own loss of sales resulting from National's decreased prices for cash-paying customers. National, however, could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud. It may have received a cash inflow from some other source or concluded that the additional sales would justify a smaller profit margin. Its lowering of prices in no sense required it to defraud the state

- 9 -

tax authority. Likewise, the fact that a company commits tax fraud does not mean the company will lower its prices; the additional cash could go anywhere from asset acquisition to research and development to dividend payouts.

Ideal III, 547 U.S. at 458-59. The Court also noted that

Ideal's lost sales could have resulted from factors other than petitioners' alleged acts of fraud. Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices.

Id. at 459. The Court envisioned proceedings that could only be "speculative," id., if Ideal were permitted to pursue its § 1962(c) claim:

A court considering the claim would need to begin by calculating the portion of National's price drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of Ideal's lost sales attributable to the relevant part of the price drop. The element of proximate causation recognized in Holmes is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.

Ideal III, 547 U.S. at 459-60. Accordingly, the Supreme Court reversed Ideal II to the extent that Ideal II had overturned the district court's dismissal of Ideal's claim under § 1962(c).

With respect to Ideal's claim under § 1962(a), however, the Supreme Court vacated and remanded for further consideration. Because Ideal II had focused principally on Ideal's § 1962(c) claim, without addressing the issue of proximate cause in connection with the claim under § 1962(a), and because the parties had devoted nearly all of their attention in the Supreme Court to the § 1962(c) claim, the Ideal III Court declined to resolve the viability of Ideal's § 1962(a) claim. The Court remanded for

- 10 -

further consideration of the proximate-cause issue in light of the differences between the two subsections:

> [i]t is true that private actions for violations of § 1962(a), like actions for violations of § 1962(c), must be asserted under § 1964(c). It likewise is true that a claim is cognizable under § 1964(c) only if the defendant's alleged violation proximately caused the plaintiff's injury. The proximate-cause inquiry, however, requires careful consideration of the "relation between the injury asserted and the injurious conduct alleged." Holmes, supra, at 268. Because § 1962(c) and § 1962(a) set forth distinct prohibitions, it is at least debatable whether Ideal's two claims should be analyzed in an identical fashion for proximate-cause purposes.

Ideal III, 547 U.S. at 461-62 (emphasis added).

C.  The Decision of the District Court on the Subsection (a) Claim on Remand:  Ideal IV

This Court remanded the matter to the district court for consideration, in light of Ideal III, of the issue of proximate cause with respect to Ideal's claim under § 1962(a). Following our remand, Ideal filed its present Complaint, reasserting only its § 1962(a) claim and its state-law breach-of-contract claim, and additional discovery was conducted.

The Complaint again described the cash-no-tax scheme conducted at National's Queens facility in the late 1990s and early 2000s, and the attendant mail and wire frauds that allowed defendants to retain unreported profits and avoid paying proper taxes. It alleged that defendants used the concealed unlawful profits and tax savings to finance the opening of the National store in the Bronx to compete with Ideal. According to the Complaint and materials developed in discovery, for 1999 and 2000

- 11 -

National filed tax returns reporting total income of $145,118. Following the commencement of the present lawsuit, however, National filed amended tax returns showing that its total income for those years had instead been nearly $1.7 million, and that for the period 1998-2003 National had underreported its taxable income by a total of $4.3 million, allowing it to underpay its taxes by approximately $1.7 million. Discovery and other proceedings revealed that the Anzas had created a corporation called Easton Development Corporation ("Easton Corporation") to purchase property in 1999 to enable National to open its store in the Bronx, and that the cash portion of the purchase price was $500,000, which was paid by National. (See Deposition of Joseph Anza at 34; Declaration of Vincent Anza dated December 12, 2008 ("Anza Decl."), ¶¶ 10, 11; Deposition of Vincent Anza ("Anza Dep.") at 188.) National began operating its Bronx store in 2000. (See Anza Decl. ¶ 4.) Defendants stated that "National expended approximately $850,000 to open its Bronx facility" (id. ¶ 5); a report prepared by accountants retained by Ideal concluded that National had spent considerably more.

Ideal asserted that prior to 2000 there were no companies capable--in either size or breadth of offerings--of competing with Ideal in the Bronx, and that in 1998-2000, Ideal consistently had annual sales in the range of $4 million - $4.6 million. It alleged that defendants' opening of the National store in the Bronx injured Ideal in two ways. First, simply by being there and offering products and services comparable to those offered by

Ideal, the new National store took customers from Ideal, causing Ideal's annual sales in 2001-2002 to drop by about one-third, to $2.7 million - $2.9 million. Second, Ideal asserts that at the Bronx store National engaged in the same cash-no-tax scheme that it conducted in the Queens store, thus allowing National to lure customers with the lower prices financed by the prior tax frauds.

Defendants moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), or alternatively for summary judgment pursuant to Fed. R. Civ. P. 56, dismissing the Complaint on the ground that Ideal could not show that its lost sales were proximately caused by the mere creation of National's Bronx facility through the alleged investment of the proceeds of racketeering activity. In Ideal Steel Supply Corp. v. Anza, No. 02 Civ. 4788, 2009 WL 1883272 (S.D.N.Y. June 30, 2009) ("Ideal IV"), the district court found defendants' position persuasive, and it granted judgment on the pleadings and, alternatively, summary judgment.

First, the court found that Ideal's Complaint failed to meet the standard set by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ("Twombly"), which requires a plaintiff to plead "'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action,'" Ideal IV, 2009 WL 1883272, at *3 (quoting Twombly, 550 U.S. at 555). The district court found that "[d]efendants argue persuasively that Plaintiff fails to plead facts showing that Ideal's lost sales were proximately caused by the mere creation of National's Bronx facility through

- 13 -

the alleged investment of an unspecified amount of RICO proceeds." Ideal IV, 2009 WL 1883272, at *4 (internal quotation marks omitted). It also found the Complaint

> deficient . . . in that it <u>does not allege facts</u> <u>explaining how</u> Defendants' investment of purported racketeering income to establish and operate its Bronx business location proximately caused Ideal to lose sales, profits, and market share. . . . Plaintiff's <u>allegations that</u> "Defendants <u>substantially decreased Ideal's sales, profits, and</u> <u>local market share, and eliminated Ideal's dominant</u> <u>market position, by using racketeering proceeds to</u> <u>acquire, establish, and operate their Bronx business</u> <u>operation</u>," . . . <u>are little more than</u> "labels and conclusions," Twombly, 550 U.S. at 555, <u>and do not</u> <u>show how</u> Defendants['] "alleged violation [of RICO] led directly to [Ideal's] injuries," [Ideal] III, 547 U.S. at 461. They are insufficient to state a claim under Section 1962(a).

Ideal IV, 2009 WL 1883272, at *4 (emphases added).

In the alternative, the district court granted defendants' motion for summary judgment. The court noted that the Supreme Court in Ideal III had found that proximate cause was lacking with respect to Ideal's 1962(c) claim because "'it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's [conduct]' because '[b]usinesses lose and gain customers for many reasons,'" Ideal IV, 2009 WL 1883272, at *6 (quoting Ideal III, 547 U.S. at 459). The district court stated that "[t]his is no less true here" with respect to the 1962(a) claim. Ideal IV, 2009 WL 1883272, at *6.

> Plaintiff's Section 1962(a) RICO claim raises the same concerns in view of Plaintiff's assertions that its injuries include "a permanent loss of sales, profits, and market share." . . . That is, it would be purely speculative . . . for this Court to conclude that Ideal's alleged injuries resulted from Defendants' conduct as opposed to other factors

- 14 -

. . . . "The element of proximate causation . . . is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." [Ideal] III, 547 U.S. at 460.

Ideal IV, 2009 WL 1883272, at *6.

The court found that proximate cause was lacking because "there were intervening factors that may have caused Ideal's alleged lost sales, profits, and diminution in market share." Id. at *5.

> For one thing, Ideal's principal, Giacomo Brancato, testified that Ideal's Bronx location had "thousands of customers that buy thousands of products for many different uses." . . . The decisions of individual purchasers, i.e., in this case presumably not to buy steel products from Ideal, have been held to constitute an independent intervening act between the alleged RICO violations and the alleged injuries.

Id. (emphases added). The court also found that "Ideal's Bronx operation had several competitors," id. at *5 n.2, that Ideal "received and accepted" inferior products, id. at *6, and that Ideal made various business decisions such as deciding whether or not to lower its prices to match those of National, see id., all of which the court held constituted intervening factors preventing Ideal from establishing proximate cause.

Accordingly, the district court dismissed Ideal's claim under § 1962(a). The court also declined to exercise supplemental jurisdiction over Ideal's state-law contract claim and dismissed that claim without prejudice. See id. at *7.

## II. DISCUSSION

On appeal, Ideal contends principally that the district court failed to take proper account of the different acts prohibited by § 1962(a) and § 1962(c) and thereby erred in concluding that Ideal could not show that defendants' use or investment of the proceeds from their mail and wire frauds to establish their Bronx facility was the proximate cause of the alleged injury to Ideal's business. It also contends, inter alia, that the court conflated proximate causation with actual causation, mischaracterized as conclusory certain of the Complaint's allegations that were factual, disregarded evidence produced in discovery that supported Ideal's § 1962(a) claim, and viewed disputed evidence in a light favoring the defendants. Defendants contend principally that the district court's view that the proximate cause inquiry with respect to Ideal's claim under subsection (a) was the same as that with respect to subsection (c) was correct because Ideal failed to plead injury on a use-or-investment theory that was distinct from the injury that it alleged resulted from the racketeering activity itself, and that the district court correctly concluded that any injury to Ideal was too remote to have been proximately caused by the opening of National's Bronx facility. In addition, defendants contend that Ideal failed to show that National invested RICO proceeds in its Bronx location and that, in any event, the § 1962(a) prohibition against the use or investment of racketeering activity proceeds

does not apply when those proceeds are used or reinvested in the same entity that engaged in the racketeering activity.

We conclude that to the extent that Ideal claims injury from National's continuation in its Bronx store of the cash-no-tax scheme conducted in the Queens store, that claim appears to be conceptually indistinguishable from the § 1962(c) claim rejected by the Supreme Court in Ideal III. The lower prices afforded to National's customers through this scheme do not involve the "investment" or "use" of the illegally derived funds.

To the extent, however, that Ideal claims that it lost sales to National because defendants invested the proceeds of their pattern of racketeering activity to establish and operate National's new store in the Bronx, we reject defendants' contentions and conclude, for the reasons that follow, that the district court erred in granting judgment on the pleadings on the basis of Twombly, and erred in granting summary judgment.

A. The Scope of Section 1962(a)

In enacting RICO, Congress was concerned about, inter alia, damage to the nation's free enterprise system by persons or entities infiltrating or operating otherwise legitimate businesses by means of criminal activities. The statement of findings and purpose that prefaces the Organized Crime Control Act of 1970 ("OCCA"), of which RICO was Title IX, states, inter alia, that

> organized crime activities in the United States
> weaken the stability of the Nation's economic system,

- 17 -

harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens.

Pub.L. 91-452, 84 Stat. 922-23 (1970) (emphasis added). RICO provisions such as § 1962(a) reflect Congress's concern about the control of otherwise legitimate business concerns "acquired by the sub rosa investment of profits acquired from illegal ventures," S. Rep. No. 91-617, at 77 (1969); see id. (infiltration of organized crime into legitimate businesses portends the "effective[] eliminat[ion]" of "[c]ompetitors").

> When organized crime infiltrates a legitimate business, its whole method of operation counters our theories of free competition and acts as an illegal restraint of trade. Whether a business is purchased from funds derived from its many unlawful activities, or whether it is acquired by extortion and violence, its aim is monopoly. . . . The vast economic power concentrated in this giant criminal conglomerate constitutes a dire threat to the proper functioning of our economic system.

116 Cong. Rec. 602 (1970) (statement of Sen. Hruska). See also S. Rep. No. 91-617, at 78 ("The syndicate-owned business, financed by illegal revenues and operated outside the rules of fair competition of the American marketplace, cannot be tolerated in a system of free enterprise." (internal quotation marks omitted)); id. at 81 (describing civil remedies intended to attack, inter alia, "corruption in the acquisition or operation of business").

The prohibitions set out in RICO are not limited to the activities of organized crime but rather extend to any person or entity engaging in a "pattern of racketeering activity" as that

term is defined in 18 U.S.C. § 1961(5). See, e.g., H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 238, 249 (1989). "To be sure, Congress focused on, and the examples used in the debates and reports to illustrate the Act's operation concern, the predations of mobsters. Organized crime was without a doubt Congress' major target . . . ." Id. at 245. But "the capacious language" Congress used in defining such terms as pattern of racketeering activity is not limited to conduct by entities having a nexus with organized crime, and "the legislative history shows that Congress knew what it was doing when it adopted commodious language capable of extending beyond organized crime." Id. at 246; see, e.g., id. at 247 ("'organized crime' simply 'a shorthand method of referring to a large and varying group of individual criminal offenses committed in diverse circumstances,' not a precise concept" (quoting 116 Cong. Rec. 35344 (1970) (statement of Rep. Poff))).

Among its civil remedies, RICO provides a private right of action for treble damages for a "person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Subsection (a) of § 1962--the remaining federal-law focus of the present litigation--provides, in pertinent part, that

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in . . . the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a) (emphases added). RICO defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. § 1961(4). For the sake of brevity, we will refer to an "enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce," id. § 1962(a), as a "commerce-affecting enterprise."

Subsection (c) of § 1962, which was the principal focus of Ideal I, II, and III, makes it unlawful for any person employed by or associated with a commerce-affecting enterprise "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Thus, "the compensable injury flowing from a violation of that provision 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern.'" Ideal III, 547 U.S. at 457 (quoting Sedima, 473 U.S. at 497) (emphasis ours).

Subsection (a), in contrast, focuses the inquiry on conduct different from the conduct constituting the pattern of racketeering activity. After there have been sufficient predicate acts to constitute such a pattern, what is forbidden by subsection (a) is the investment or use of the proceeds of that activity to establish or operate a commerce-affecting enterprise. Thus, the plaintiff asserting a civil RICO claim based on a violation of subsection (a) must show injury caused not by the pattern of

racketeering activity itself, but rather by the use or investment of the proceeds of that activity, see, e.g., Ouaknine v. MacFarlane, 897 F.2d 75, 82-83 (2d Cir. 1990).

Further, the numerous disjuncts in § 1962(a) create a broad prohibition. Assuming a pattern of racketeering activity and a commerce-affecting enterprise, both the funds derived "directly or indirectly" from such activity and the "proceeds of such income" are tainted: no part of the "income, or the proceeds of such income" may lawfully be "use[d] or invest[ed]," whether "directly or indirectly," in "the establishment or operation" of that enterprise. Thus, although the injury alleged to result from the violation of subsection (a)--as from the violation of any other subsection of § 1962--must be sufficiently directly related to the violation to meet the legal standard of proximate cause implied in § 1964(c), the many disjuncts in § 1962(a) mean that any of dozens of combinations or permutations will constitute a violation of that section. And

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, see United States v. Turkette, 452 U.S. 576, 586-587 (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91-452, § 904(a), 84 Stat. 947. The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity.

Sedima, 473 U.S. at 497-98 (emphases added); see id. at 491 n.10 ("[I]f Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident.")

- 21 -

Given the breadth with which RICO is to be interpreted, we reject for two reasons defendants' contention that § 1962(a)'s prohibition against the use or investment of racketeering activity proceeds is inapplicable to their alleged use of pattern-of-racketeering-activity proceeds to open National's Bronx facility on the theory that that section does not apply when such proceeds are simply used or reinvested in the same entity that engaged in the racketeering activity. First, defendants' factual premise is flawed; they did not merely reinvest in the same entity. Rather, the Anzas created a new company, Easton Corporation, to purchase the Bronx property for the new National store. Second, even if Congress did not intend subsection (a)'s prohibition to reach the use of RICO tainted funds by the RICO violator in its own ongoing operation, the legislative history does not permit the inference that Congress meant to allow such entities, with impunity, to use those funds to branch out to new locations.

Finally, in keeping with the proper recognition of RICO's breadth, we note that "income" as used in § 1962(a) was doubtless not intended by Congress to be interpreted restrictively to exclude moneys unlawfully retained by means of racketeering activity. In describing the RICO sections of the bill that became the OCCA, the report of the Judiciary Committee of the House of Representatives stated that "[s]ubsection (a) makes it unlawful to invest funds derived from a pattern of racketeering activity, as defined in section 1961(1)," H.R. Rep. No. 91-1549, at 57, reprinted in 1970 U.S. Code Cong. & Admin. News 4007, 4036

- 22 -

(emphasis added). We can discern no meaningful distinction, for RICO purposes, between income fraudulently acquired and income fraudulently retained; both result in funds not otherwise available but for the fraud. Thus we view moneys unlawfully saved or withheld by means of a pattern of mail and wire frauds, as is alleged in the present case, as falling within the meaning of § 1962(a)'s reference to "income." Nor have defendants urged a narrower interpretation.

In sum, with respect to Ideal's claim under § 1962(c), "[t]he proper referent of the proximate-cause analysis [was the] alleged practice of conducting National's business through a pattern of" mail and wire fraud in connection with its tax obligations, "defrauding the State." Ideal III, 547 U.S. at 458. Given this frame of reference, Ideal's injury, i.e., loss of sales to National, was "attenuated," id. at 459, because the direct victim of that activity was the State of New York. But "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" Staub v. Proctor Hospital, 131 S. Ct. 1186, 1192 (2011) (quoting Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 989 (2010) ("Hemi")). With respect to the claim under § 1962(a), the proper referent in the proximate-cause analysis is defendants' "use or invest[ment]" of the funds, derived directly or indirectly from the alleged pattern of racketeering activity, to establish or operate the National facility in the Bronx.

- 23 -

With these principles in mind, we turn to the matter of whether Ideal's Complaint was properly dismissed on the ground that it failed to plead, or that Ideal failed to adduce evidence, that defendants' investment or use of funds derived from the pattern of mail and wire frauds was a proximate cause of Ideal's alleged injury at its Bronx store.

B.  The Dismissal Pursuant to Rule 12(c)

As indicated in Part I.C. above, the district court dismissed the Complaint pursuant to Rule 12(c) on the grounds that it did not specify the amount of RICO proceeds used to create National's Bronx facility, Ideal IV, 2009 WL 1883272, at *4, and "d[id] not allege facts explaining how Defendants' investment of purported racketeering income to establish and operate its Bronx business location proximately caused Ideal to lose sales, profits, and market share," id.; and that Ideal's "allegations that Defendants substantially decreased Ideal's sales, profits, and local market share, and eliminated Ideal's dominant market position, by using racketeering proceeds to acquire, establish, and operate their Bronx business operation, . . . [we]re little more than 'labels and conclusions,'" id. (quoting Twombly, 550 U.S. at 555 (other internal quotation marks omitted)), or "'a formulaic recitation of the elements of a cause of action,'" id. at *3 (quoting Twombly, 550 U.S. at 555).  We disagree with the district court's characterizations and its application of Twombly.

First, the Twombly Court noted that Fed. R. Civ. P. 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," Twombly, 550 U.S. at 555 (other internal quotation marks omitted); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 512 (2002) (to satisfy Rule 8(a)(2), a plaintiff who alleges facts that provide fair notice of his claim need not also allege "specific facts establishing a prima facie case"). The Twombly Court, while stating that mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do," stated that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but only "[f]actual allegations [that are] enough to raise a right to relief above the speculative level," 550 U.S. at 555, i.e., enough to make the claim "plausible," id. at 570; see Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The Twombly Court stated that "[a]sking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." 550 U.S. at 556.

The district court in Ideal IV demanded of Ideal a pleading at a level of specificity that was not justified by

Twombly. The Complaint's "allegations that Defendants substantially decreased Ideal's sales, profits, and local market share, and eliminated Ideal's dominant market position, by using racketeering proceeds to acquire, establish, and operate their Bronx business operation," Ideal IV, 2009 WL 1883272, at *4 (internal quotation marks omitted), were not properly characterized as "labels," id., nor could the allegations--as they were set forth in the Complaint--be considered a mere formulaic repetition of the statutory language or considered so conclusory as to lack facial plausibility. The Complaint alleged, inter alia, that the income of National, as a Subchapter S corporation under the Internal Revenue Code, passed through to the Anzas as its sole shareholders (see Complaint ¶ 26); that from at least 1996 to the spring of 2004, National and the Anzas filed fraudulent tax returns understating the amount of their taxable income and enabling them to save and amass substantial funds (see, e.g., id. ¶¶ 28, 30, 61); that after the commencement of this lawsuit in 2002, defendants admitted the falsity of those income tax returns by filing amended returns showing that they had falsely underreported National's income to tax authorities for several years (see id. ¶ 29); that defendants' false tax returns from 1996 to spring 2004 were filed by mail and fax, violated federal laws against mail and wire fraud, and constituted a pattern of racketeering activity in violation of RICO (see id. ¶¶ 34-35, 45, 61); that for each of the years 1999 and 2000, defendants reported taxable income of less than $100,000 (see id.

¶ 38); that the purchase and renovation expenses for National's Bronx facility were capital expenses that could not be funded with pre-tax dollars (see id. ¶ 39); that the expense of purchasing, renovating, equipping, stocking, and opening National's Bronx facility was estimated by Ideal to be in excess of $1 million (see id. ¶ 37); and that in 1999-2000, defendants fraudulently underreported their income by more than $1 million (see id. ¶ 40). The Complaint alleged that before National opened its Bronx facility, Ideal had a dominant market position there, with no serious competitors, as no other Bronx vendors offered as comprehensive an array of goods and services as Ideal (see id. ¶ 11); that National's Bronx facility, opened in the summer of 2000 a mere eight minutes' drive from Ideal's facility, began to offer an array of goods and services similar to those offered by Ideal (see id. ¶¶ 9-15); and that the opening of National's Bronx facility caused a substantial decrease in Ideal's sales, profits, and local market share (see id. ¶ 43). We see nothing implausible in the allegations that a plaintiff business entity that had once enjoyed a dominant market position, with no serious competition from other, more limited, entities, lost business when a large competitor comparable in size and offerings to the plaintiff opened nearby.

Second, although the standards for dismissal pursuant to Rule 12(c) are the same as for a dismissal pursuant to Rule 12(b)(6), see, e.g., Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998), and the standard set by Twombly for evaluation of the

viability of the pleading is the same under each Rule, see, e.g., Hayden v. Paterson, 594 F.3d 150, 160-61 (2d Cir. 2010), we view the district court's focus solely on the allegations of the Complaint, given the posture of this case, as a misapplication of Twombly. Twombly is meant to allow the parties and the court to avoid the expense of discovery and other pretrial motion practice when the complaint states no plausible claim on which relief can be granted:

> [W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.

Twombly, 550 U.S. at 558 (internal quotation marks omitted) (emphasis ours). In the present case, the point of minimum expense had long since been passed. The case had been addressed at each of the three levels of the federal judicial system; and, by the time of Ideal IV, discovery had been completed. To be sure, whether the complaint states a claim upon which relief can be granted is a question of law, and that question may be raised even as late as at the trial of the action, see Fed. R. Civ. P. 12(h)(2). But pleadings often may be amended. Prior to trial, after the time to amend as of right has passed, "[t]he court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2); see, e.g., Rachman Bag Co. v. Liberty Mutual Insurance Co., 46 F.3d 230, 234-35 (2d Cir. 1995); see also Fed. R. Civ. P. 15(b)(1) (even at trial, "[t]he court should freely permit an amendment" to conform the pleadings to the proof,

unless the objecting party can show prejudice). Indeed, the availability of "amendment of pleadings" was one of the reasons for Congress's expectation that the private right of action for RICO violations would be an effective tool. S. Rep. No. 91-617, at 82.

In light of the fact that discovery in this case had been completed prior to the decision in Ideal IV, we do not regard Twombly as requiring that defendants' Rule 12(c) motion be granted if evidence that had already been produced during discovery would fill the perceived gaps in the Complaint. For example, although the district court found persuasive the defendants' argument that the Complaint did not specify how much RICO income was invested to create the National facility in the Bronx, materials in the record showed that the purchase price of the property was $2.5 million; that of that sum, $500,000 in cash was paid at the closing, and that that $500,000 was provided by National (see, e.g., Anza Dep. at 186-87, 435); that defendants admit that opening the Bronx store cost at least $850,000 (see, e.g., Anza Decl. ¶ 5); and that Ideal's expert accountant estimated that the total cost exceeded $1 million. To the extent that the district court viewed as conclusory the Complaint's allegations that defendants had filed income tax returns that substantially understated their taxable income, the court should have taken into account the tax returns in the record--both those that were originally filed by National showing less than $73,000 in taxable income for each of the years 1999 and 2000, and the amended returns showing taxable income for

those two years totaling nearly $1.7 million, as well as the deposition testimony of an accountant for National that those and other amended returns filed for National showed that for 1998-2003 National had unreported income totaling approximately $4.3 million (see Deposition of Jay L. Ofsink at 40). And to the extent that the court viewed the Complaint's allegation that Ideal's Bronx operation lost sales after the advent of National as conclusory, it should have taken into consideration, inter alia, the deposition testimony of Ideal's sole shareholder, Giacomo Brancato, who stated that in each of the years 1998, 1999, and 2000, Ideal had sales in the range of $4 million - $4.6 million (Deposition of Giacomo Brancato ("Brancato Dep.") at 282); and that after National opened its Bronx facility in the summer of 2000, Ideal's sales in 2001 and 2002 dropped by about one-third, to $2.7 million - $2.9 million (see id.). The record also permits the inference that the sales lost by Ideal were made by National. National's tax returns for 2001 and 2002 showed that its gross sales for those years, the first two full years of its Bronx facility's operation, were, respectively, some $1.2 million and $2.3 million more than its gross sales during the last year before the Bronx facility was opened. Although the returns do not provide figures for National's Queens and Bronx facilities separately, it is surely inferable that at least a substantial portion of its 24-47% increase in sales was attributable to the Bronx facility.

In these circumstances, assuming the truth of the Complaint's allegations and of evidence in the record supporting those allegations, if defendants' investment of the proceeds of their alleged pattern of mail and wire frauds has not sufficiently directly harmed Ideal to meet the standard of proximate cause, we find it difficult to envision anyone who could show injury proximately caused by that investment--or to fathom to whom Congress meant to grant a private right of action under subsection (a). We conclude that the district court erred in dismissing Ideal's Complaint pursuant to Rule 12(c).

C. Summary Judgment

The principles governing summary judgment are well established. Such a motion "may properly be granted--and the grant of summary judgment may properly be affirmed--only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010); see Fed. R. Civ. P. 56(a). In reviewing the evidence to determine whether the movant is entitled to judgment as a matter of law, the court "may not make credibility determinations or weigh the evidence" and "must draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) (emphasis added). The function of the district court in considering the motion for summary judgment is not to

resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

Applying these principles, we first reject defendants' contention--which the district court did not adopt--that they are entitled to summary judgment on the ground that Ideal failed to prove that they invested funds derived from the alleged pattern of racketeering activity in the establishment of National's Bronx facility. The matter of whether or not defendants "directly or indirectly" invested or used proceeds derived "directly or indirectly" from such activity, 18 U.S.C. § 1962(a), is clearly a question of fact that could not properly be resolved by the court on summary judgment.

The district court, as set forth in Part I.C. above, ruled that defendants were entitled to summary judgment because it found the evidence insufficient to show that Ideal's alleged loss of sales was proximately caused by defendants' conduct. In ruling that it would be "purely speculative . . . to conclude that Ideal's alleged injuries resulted from Defendants' conduct," Ideal IV, 2009 WL 1883272, at *6, the court pointed to other possible factors, including the decisions of individual customers, the quality of Ideal's steel products, actions taken by other steel companies in the area, and decisions by Ideal's management as to whether to match National's prices, see id. We conclude

that none of these factors justified granting judgment against Ideal as a matter of law.

As a general matter, the district court viewed the proximate cause inquiry as the same for a claim under subsection (a) as for one under subsection (c), and it does not appear to have given effect to the different referents required by the different prohibitions. In Ideal III, the Court found that proximate cause was lacking for Ideal's subsection (c) claim because "the cause of Ideal's harm was 'a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State).'" Hemi, 130 S. Ct. at 990 (describing and quoting Ideal III, 547 U.S. at 458). Hemi emphasized that the Supreme Court's RICO proximate cause precedents make "clear . . . that 'the compensable injury flowing from a [RICO] violation . . . "necessarily is the harm caused by [the] predicate acts."'" 130 S. Ct. at 991 (quoting Ideal III, 547 U.S. at 457 (quoting Sedima, 473 U.S. at 497)). With respect to Ideal's subsection (a) claim, however, the act constituting the violation is the very act that causes the harm: the use or investment of the funds derived from the pattern of mail and wire frauds to establish and operate the Bronx store is both the violation and the cause of Ideal's lost sales. The district court, in stating that "[t]he decisions of individual purchasers . . . have been held to constitute an independent intervening act between the alleged RICO violations and the alleged injuries," Ideal IV, 2009 WL 1883272, at *5, does not appear to have focused on the fact that the alleged subsection

(a) violation itself, the investment or use of all or part of the income derived directly or indirectly from the racketeering activity in the establishment or operation of a store that simply by its existence attracts customers away from a competitor, may be the direct cause of injury to the plaintiff in its business or property.

We note also that the only cases cited by the district court as holding that decisions of individual purchasers are an intervening cause that defeats proximate cause were district court cases. In Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 651 (2008), the Supreme Court, in rejecting the proposition that a civil RICO plaintiff complaining of a pattern of mail fraud must prove its own reliance, proffered the following hypothetical:

> suppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves. If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business "by reason of" a pattern of mail fraud, even though they never received, and therefore never relied on, the fraudulent mailings.

Id. at 649-50. Plainly, in this hypothetical, the fact that the plaintiff's loss of business would have resulted from customer decisions does not defeat proximate cause.

The district court also found an intervening cause in the fact that "Brancato testified that at various times between 1996 and 2003 Ideal received and accepted from its vendors steel products that were bent and rusty." Ideal IV, 2009 WL 1883272, at *6 (internal quotation marks omitted). The court's reliance on

- 34 -

the possibility that Ideal may have lost business because of inferior products suffers two flaws. First, that possibility raises a question of but-for causation, rather than proximate causation; but-for causation is an issue of fact for the jury, see, e.g., Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989), not, where there is evidence to support a finding of causation, a matter to be decided by the court on a motion for summary judgment. Second, the record did not compel the court's inference as a matter of fact. The deposition testimony to which the court referred explained that some products that are unsuitable for one category of customers may well be welcomed by another category; the testimony did not state that any customers who purchased from Ideal were dissatisfied. (See, e.g., Brancato Dep. at 318-35.) The court's suggestion that Ideal lost customers because of inferior products plainly did not view the record in the light most favorable to Ideal.

The court's additional suggestion that Ideal may have lost sales because of "actions taken by other steel companies in the area," Ideal IV, 2009 WL 1883272, at *6, does not appear to have any anchor in the record. Nothing has been called to our attention to suggest that the 1998-2000 conduct--or sales volume-- of any such companies, which provided no real competition for Ideal (see Brancato Dep. at 283), changed in 2001-2002, when Ideal's sales dropped by one-third (and the sales of National, with its new facility, increased by 24-47%).

Finally, the court's suggestion that Ideal may have lost sales because of its "business decisions--e.g., to lower its prices to compete with National," Ideal IV, 2009 WL 1883272, at *6, seems to have lost sight of the alleged RICO violation, i.e., the investment of racketeering activity funds to establish the National facility in the Bronx. Had the investment not been made, there would have been no National prices for Ideal to match.

## CONCLUSION

We have considered all of defendants' arguments in support of the judgment and have found them to be without merit. The judgment of the district court is vacated, and the matter is remanded for trial.

JOSÉ A. CABRANES, *Circuit Judge*, dissenting:

We encounter here another chapter in the long saga of civil RICO and its discontents. Since its enactment in 1970, the civil RICO statute, Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, has exasperated generations of federal judges and practitioners and generated a vast, and often skeptical, literature.[1]

The dispute presently before us involves competing small businesses in the steel mill products trade. It has already consumed nine years of litigation in the federal courts, including one trip to the Supreme Court, *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) (to employ the citation adopted by today's majority opinion, "*Ideal Steel III*"). One eventful trip to 1 First Street surely deserves another.

\* \* \*

From its beginnings before Judge Richard Berman, a seasoned federal trial judge, the case has presented the question whether plaintiff Ideal Steel Corporation ("Ideal") can deploy the heavy legal armaments of RICO in a civil action against its chief rival, National Steel Supply, Inc. ("National"), based on National's alleged illegal business practices.

In its complaint, Ideal raised two distinct civil RICO claims, one under 18 U.S.C. §

---

[1] *See, e.g.*, William H. Rehnquist, *Remarks of the Chief Justice*, 21 St. Mary's L.J. 5, 9-21 (1989); William H. Rehnquist, *Get Rico Cases Out of My Courtroom,* Wall St. J., May 19, 1989, at A14; David B. Sentelle, *Civil RICO: The Judges' Perspective, and Some Notes on Practice for North Carolina Lawyers,* 12 Campbell L. Rev. 145 (1990).

To be sure, RICO—and its application in civil suits—is not without its defenders. *See, e.g.*, G. Robert Blakey & Thomas A. Perry, *An Analysis of the Myths that Bolster Efforts To Rewrite RICO and the Various Proposals for Reform: "Mother of God—Is this the End of RICO?"*, 43 Vand. L. Rev. 851 (1990) (defending the "legitimacy" of RICO); G. Robert Blakey, *Civil RICO: A Rebuttal to Some Myths Spurring Reform Effort in Congress*, Nat'l L.J., Aug. 3, 1987, at 26 (a defense of civil RICO). It should be noted, however, that its defender-in-chief, Professor Blakely, was the Chief Counsel of the Senate Subcommittee in Criminal Laws and Procedure when the RICO statute was passed, *see* Gary S. Abrams, *The Civil RICO Controversy Reaches the Supreme Court*, 13 Hofstra L. Rev. 147, 149 n.9 (1984), and is touted as one of its chief architects, *see, e.g.,* G. Robert Blakey, *The RICO Civil Fraud Action in Context: Reflections on* Bennett v. Berg, 58 Notre Dame L. Rev. 237, 237 n.3 (1982).

1962(a)[2] and the other under 18 U.S.C. § 1962(c).[3]  Claims under each of these provisions "must be asserted under [18 U.S.C.] § 1964(c)," *id.* at 461-62, which provides a cause of action to persons injured "by reason of" a defendant's alleged RICO violation, 18 U.S.C. § 1964(c).[4]

Ideal's § 1962(c) claim alleged that National's owners, Joseph and Vincent Anza, conducted the affairs of an interstate business enterprise (National) "through a pattern of racketeering activity"—specifically, by refraining from charging their cash-paying customers requisite New York sales tax and by subsequently filing false tax returns with the State of New York.  *See Ideal Steel III*, 547 U.S. at 454.  The Supreme Court rejected this claim, *id.* at 461, and directed us to consider on remand the § 1962(a) claim, which accuses the Anzas and National (jointly, "defendants") of investing funds *derived from the alleged tax fraud scheme* in order to open and operate a new store in the Bronx.  *Id* at 462.  We are thus required to ascertain whether Ideal adequately pleaded its § 1962(a) civil RICO suit against defendants—in particular, we are asked to determine "whether [defendants'] alleged violation of § 1962(a) proximately caused the injuries Ideal asserts."  *Id.* at 462.  Unlike my

---

[2] In relevant part, § 1962(a) provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

[3] Section 1962(c) states, in full, that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs *through a pattern of racketeering activity* or collection of unlawful debt."  18 U.S.C. § 1962(c) (emphasis added).

[4] In relevant part, § 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"  18 U.S.C. § 1964(c).

2

colleagues, I think that the "'relation between the injury asserted and the injurious conduct alleged'" in Ideal's § 1962(a) claim is, like its § 1962(c) claim, too remote and speculative to satisfy the necessary proximate-cause analysis. *Id.* (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). Accordingly, I respectfully dissent.

I.

In *Ideal Steel III*, the Supreme Court held that Ideal could not maintain its RICO claim under § 1962(c), *see* note 2, *ante*, because it failed to satisfy the requirement of proximate causation set forth in *Holmes,* 503 U.S. 258. *See Ideal Steel III*, 547 U.S. at 461. The Court concluded that the relation between the injurious conduct alleged (defrauding a third party, the State of New York, of tax revenues) and the injury asserted by Ideal (lost sales due to the competitive advantage thus gained by National) was too attenuated to establish proximate cause. *Id.* at 458. The Court found support for this conclusion by considering the "underlying premises" of the "directness requirement[ ]" that must be satisfied in order to prove that a defendant's actions have proximately caused injury to a plaintiff. *Id.* The Court held that Ideal's theory of recovery under § 1962(c) was simply too remote and too dependent on contingent propositions to meet this requirement. *See id.* at 458-60.

We must now evaluate whether Ideal's claim under § 1962(a) can withstand the proximate causation analysis set forth in *Ideal Steel III* and *Holmes*. *See id.* at 462 ("The proximate-cause inquiry . . . requires careful consideration of the 'relation between the injury asserted and the injurious conduct alleged.' Because § 1962(c) and § 1962(a) set forth distinct prohibitions, it is at least debatable whether Ideal's two claims should be analyzed in an identical fashion for proximate-cause purposes." (quoting *Holmes*, 503 U.S. at 268)).

The essence of Ideal's claim under § 1962(a) is that defendants used funds earned directly or indirectly from the alleged "pattern of racketeering activity" in order to help establish or operate a

3

new facility in the Bronx, and that the operations of this new store had the effect of substantially decreasing Ideal's sales, profits, and local market share. *See Ideal Steel Supply Corp. v. Anza*, No. 02 Civ. 4788, 2009 WL 1883272, at *4 (S.D.N.Y. June 30, 2009). The "proper referent" for proximate causation analysis of the § 1962(c) claim in *Ideal Steel III* was defendants' "alleged practice of conducting National's business through a pattern of defrauding the State [of New York]" of tax revenues, *Ideal Steel III*, 547 U.S. at 458, while the proper referent of our proximate causation analysis under § 1962(a) is the defendants' investment of income acquired through the alleged pattern of racketeering activity into the creation of a new store that competed with Ideal.

The majority opinion concludes that this theory of causation for the § 1962(a) claim is more direct and certain than Ideal's failed § 1962(c) claim. *See* Majority Op. at 20-21. The principal failure of the § 1962(c) claim, as the Supreme Court pointed out, was that plaintiffs could not demonstrate that the money defendants saved by allegedly committing tax fraud was used in such a way as to ultimately result in increased competition for Ideal's business. *See Ideal Steel III*, 547 U.S. at 459. The § 1962(a) claim is said to be different, however, in the following way: although the alleged offense under § 1962(c) is the "racketeering activity" itself (here, tax fraud), the alleged offense under § 1962(a) is the *reinvestment* of the funds derived from the racketeering activity. Although the only legally cognizable victim of the tax fraud was the State, *see Ideal Steel III* at 458, the Court suggested that there is arguably a larger set of potentially cognizable victims affected by the reinvestment of the ill-gotten funds. Thus, under § 1962(a), Ideal's "injury" may be more closely connected to defendants' alleged conduct.

Nevertheless, the link between (i) the use of racketeering (or, "ill-gotten") funds to help establish National's new store in the Bronx, and (ii) the ultimate impact on Ideal's bottom line, is not nearly as direct as Ideal—and the majority—seems to believe. Critically, the alleged illegal activity *is not* National's creation of a new store in the Bronx—on its own, a perfectly legitimate, competitive

4

pursuit—but rather, defendants' investment of ill-gotten proceeds.

This distinction is important. It may be that the Bronx facility would not exist but for the alleged ill-gotten investment; on the other hand, it may also be that the economic projections concerning the development of a National facility in the Bronx were so promising, and access to abundant capital so cheap, that the decision to open the Bronx store was unaffected (either in terms of its opening date or the scope of its operations) by whatever ill-gotten proceeds were available. Although the truth likely lies somewhere in between, it is doubtful that any court could come up with a reasonably certain answer in light of the overwhelming number of variables inherent in this inquiry.

Nor would the causation analysis be resolved, even if we assumed, for the argument, that the impact of the ill-gotten investment on the operation of National's Bronx facility could be readily ascertained. Rather, we would next be obliged to determine precisely how this impact "injured" Ideal (apart from the myriad other factors that may have adversely affected Ideal's business). "The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation. It has particular resonance when applied to claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws." *Ideal Steel III*, 547 U.S. at 460.

## II.

The danger of blurring the line between RICO and the antitrust laws is a real one. Justice Breyer's separate opinion in *Ideal Steel III* is particularly instructive in explaining why this is so. If, as today's panel opinion suggests, companies can pursue civil RICO claims against their competitors on the basis of allegations that ill-gotten proceeds have funded perfectly legitimate and competitive pursuits, RICO can be misused as a weapon against competition in the marketplace. As Justice Breyer observed, "[f]irms losing the competitive battle might find bases for a RICO attack on their

5

more successful competitors in claimed misrepresentations or even comparatively minor misdeeds by that competitor." *Ideal Steel III*, 547 U.S. at 485 (Breyer, J., concurring in part and dissenting in part). Indeed, businesses that are suffering economically as a result of increased competition would surely be tempted to accuse its competitors of financial, or other, malpractices on the part of competitors, in order to seek treble-damages under RICO, as Ideal has here.

In light of (i) the broad scope of RICO (and what might constitute proceeds from a RICO "predicate act"), and (ii) the specter of paying treble damages, the mere threat of such a suit would chill competition. When one considers the number of different entities that could plausibly allege to have been "injured" by the market activity in question—various competitors, suppliers to the various competitors, *etc.*—the potential threat is compounded. As this very case establishes, it does not take an elaborate or unusual set of facts for a business to be subjected to a seriously threatening RICO suit by a competitor; after all, the essence of the present suit is that defendants allegedly filed false tax returns and then used the corresponding savings to open a new store that enabled them to compete more effectively (and unfairly), reducing the profits and value of Ideal's business. "Firms that fear such treble-damages suits might hesitate to compete vigorously, particularly in concentrated industries where harm to a competitor is more easily traced but where the consumer's need for vigorous competition is particularly strong. The ultimate victim of any such tendency to pull ordinary competitive punches of course would be not the competing business, but the consumer." *Ideal Steel III*, 547 U.S. at 485-86 (Breyer, J., concurring in part and dissenting in part).

If today's majority were right on the law, the adverse consequences of its holding—stemming from a broad interpretation of the RICO statute—would ordinarily be a concern reserved for the attention of Congress. But, as Justice Breyer recognized, Congress has already spoken to this question through the antitrust laws. "The basic objective of antitrust law is to encourage the competitive process. In particular, [antitrust law] encourages businesses to compete

6

by offering lower prices, better products, better methods of production, and better systems of distribution." *Id.* at 482 (citing Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶100a, pp. 3-4 (2d ed. 2000)). While it is true that antitrust law is far from the exclusive means by which Congress seeks to regulate conduct between competitive businesses, "there is no sound reason to interpret RICO's treble-damages provision as if Congress intended to set it and its antitrust counterpart at cross-purposes." *Id.* at 486.

As Justice Breyer noted, it is difficult enough to establish causation in antitrust cases where plaintiffs seek to link certain economic injuries to specified *anti-competitive* conduct. *Id.* at 484. But at least in those cases, all concerned, including the parties and the court, have a reasonable prospect of identifying what might have happened had the relevant industry not been exposed to improper *anti-competitive* activity where the injurious conduct can be distinguished from otherwise competitive market conditions. The task becomes significantly more difficult when courts have to consider what might have happened absent some specified *pro-competitive* activity—activity that will likely be all but impossible to isolate in the context of an efficient market.

Justice Breyer's solution to the problems identified above was to assert that § 1964(c)'s proximate causation requirement (as applied to both § 1962(a) *and* § 1962(c)) "places outside the provision[s] harms that are traceable to an unlawful act only through a form of legitimate competitive activity." *Id.* at 486. In other words, "ordinary competitive actions undertaken by the defendant competitor cut the *direct* causal link between the plaintiff competitor's injuries and the forbidden acts." *Id.* at 482. Justice Breyer's proposed "test" is consistent with the proximate causation analysis for § 1962(c) articulated in the majority opinion in *Ideal Steel III*. Under *Ideal Steel III*'s own terms, a civil RICO plaintiff will almost invariably be prevented from recovering under § 1964(c) for harms that are traceable to an unlawful act but that reveal themselves only through a

7

form of legitimate competitive activity. Any such suit would necessarily require an analysis of (a) the impact of the alleged unlawful act on the legitimate competitive activity in question, and (b) the economic harm to plaintiffs directly attributable to the change in legitimate competitive activity caused by the ill-gotten investment. This is exactly the intricate, speculative, and highly contingent analysis that *Ideal Steel III* spurned. *See id.* at 460 (majority op.).

In sum, with Justice Breyer, "I believe that the financing of a new store—even with funds generated by unlawful activities—is not sufficient to create a private cause of action as long as the activity funded amounts to legitimate competitive activity." *Id.* at 487 (Breyer, J., concurring in part and dissenting in part). By holding otherwise, the majority has warped civil RICO into a tool that aggrieved business interests will use to harass and undermine competitors engaged in legitimate, competitive business activities. This in turn will put the courts in the nearly impossible position of having to ascertain which otherwise legal marketplace activity can be directly linked to ill-gotten investments and which cannot. Accordingly, I would affirm the judgment of the District Court that Ideal failed to state a claim upon which relief can be granted.